UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

STEVE RISNER,                              Case No. 1:11-cv-00191
       Plaintiff,                       Litkovitz, M.J.

      vs.


REGAL MARINE INDUSTRIES, INC.,             **ORDER**
      Defendant.


    A bench trial was held before the Court on May 13 through 17, 2013, in this diversity

action to resolve plaintiff Steve Risner's statutory and common law claims against defendant

Regal Marine Industries, Inc.  The lawsuit arises out of the parties' dispute over a pleasure boat

manufactured by Regal and acquired by plaintiff.  Plaintiff asserts causes of action under Ohio

law for breach of express and implied warranties; violation of the Ohio Consumer Sales Practices

Act (CSPA), Ohio Rev. Code §§ 1345.01, *et seq.*; and negligent misrepresentation and

intentional misrepresentation.  The Court hereby enters its findings of fact and conclusions of

law pursuant to Fed. R. Civ. P. 52(a)(1).[1]

**I. Findings of Fact**

**A. Background information**

    1.  Plaintiff Steve Risner ("Risner") is a citizen and resident of Ohio.  He is a graduate of

        The Ohio State University and has been in the construction business for the last 42

---

[1] Rule 52(a)(1) states: "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58."  Fed. R. Civ. P. 52(a)(1).

years.  For the past 20 years he has owned a general contracting company which builds commercial and industrial buildings, schools and hospitals, with projects ranging from $10,000.00 to $130,000,000.00.  Plaintiff has experience formulating deals with subcontractors as well as experience with bid situations and complicated contracts.

2. Plaintiff also has experience operating construction equipment, including bulldozers, backhoes and cranes.

3. Plaintiff had boated with friends and operated friends' boats on Lake Cumberland in Kentucky for ten years as of 2009.  He planned to retire in 2010 and began shopping for boats in 2009.

4. Plaintiff planned to dock his boat at a resort called Conley Bottom at Lake Cumberland. The boating season in the Lake Cumberland area generally runs from mid-April until some point in October and there are three major boating holidays during the season: Memorial Day, Fourth of July, and Labor Day.

5. Defendant Regal Marine Industries, Inc.  ("Regal") is a corporation organized and existing under the laws of the state of Florida with its principal place of business in Florida.

6. Regal is in the business of manufacturing boats.  Regal authorizes a dealer to market and sell its boats to the public pursuant to a sales and service agreement ("SSA"), which governs the relationship between Regal and the dealer.  Regal sells boats directly to dealers, and dealers set the retail prices for the boats they sell to customers.

7. At all relevant times, Duane Kuck was the president and part-owner of Regal in charge of sales and marketing, product development, engineering and finance.  All vice-presidents of the company reported directly to him.

2

8. At all relevant times, Marty Clement was Regal's vice-president in charge of materials, customer support, and information technology ("IT").

9. Duffy Stenger was, at all relevant times, Regal's vice-president of sales and marketing. All regional sales managers reported directly to him.

10. Sigurd Rudholm was Regal's Midwest Regional Sales Manager from 2005 to March 2011.

**B. Regal's website**

11. Regal's mission statement is found at Regal's website, www.regalboats.com.  The website at all relevant times stated:  "With God's help and a Steadfast Commitment to Integrity, We will Develop a Team of Exceptional People and Relationships to Provide Exceptional Customer Satisfaction."  Exh. PX-1 at 9.[2]

12. At all relevant times, the website listed certain Regal awards under a section captioned "JD Power Awards."  The middle paragraph of this section reads, in part: "Receiving these recognitions again . . . demonstrates total dedication by Regal's employees and dealer network to our highest priority: creating an exceptional boating experience for our customers."  Exh. PX-1 at 4.  "Customers" as used in this section refers to Regal boat owners.

13. Another section of Regal's website is captioned "REGAL ONE - THE PROMISE OF O.N.E."  This section of the website includes the following statements:

> When your professional mission is to take care of people, you develop a philosophy designed to ensure that Regal owners experience an exceptionally high level of customer service and attention.  Regal's Owner Nexus Experience must be working considering this compelling body of evidence.
> . . . .

---

[2] This Order references only exhibits that were admitted into evidence at trial.  Plaintiff's exhibits are designated herein as "PX" and defendant's exhibits are designated as "DX."

> How do we keep such high standards and earn such lofty awards? One customer at a time. A call to a factory-trained Regal dealer is typically the only call our customers ever have to make. But when the need for factory assistance arises, we're there, handling each opportunity with first-call resolution to get you back on the water as quickly as possible. . . . At Regal, customer satisfaction is more than a promise. It's in our DNA.

Exh. PX-1 at 12-13.

## C. Land N Sea

14. Land N Sea ("LNS") was a boat dealership which Mark Williams opened in Cincinnati, Ohio in 2005. LNS was an authorized Regal boat dealer from June 2005 to July 2010. Regal had no involvement in LNS's day-to-day operations.

15. On May 12, 2008, LNS and Regal entered into a new three-year SSA whereby LNS would continue as a Regal dealer. Exh. PX-76. Stenger of Regal signed the SSA on December 9, 2008. Exh. PX-76 at 9.

16. A Regal dealer finances Regal boats through a third-party financing company with whom the dealer has a contractual inventory financing agreement called a floor plan agreement.

17. LNS had a floor plan agreement with GE Commercial Distribution Finance Corporation ("GE"), which was known as LNS's floor plan lender. Exh. PX-76 at 3, ¶ 5.2.

18. Under LNS's floor plan agreement, GE had a security interest in all boats that it financed for LNS, and LNS was required to pay GE upon the sale of any financed boat.

19. As part of the floor plan agreement, GE would periodically audit and monitor LNS's financial stability.

20. On August 19, 2008, GE sued LNS in Hamilton County, Ohio, alleging that LNS had breached the floor plan agreement, including by selling boats out of trust ("SOT").

21. SOT means the dealer has financed the manufacture of a boat through a floor planner; has delivered the boat to the customer who ordered the boat; has received payment for the boat from the customer; but has not paid the floor planner who financed the boat.

22. It is an indication of financial distress when a dealer is in an SOT situation and has exceeded its line of credit.

23. If the floor planner does not receive payment upon the sale of a boat it has financed, then the dealer is in breach of the floor plan agreement. In such instances, the floor plan lender has the right to terminate the dealer's floor plan agreement or to negotiate a forbearance agreement with the dealer.

24. As a result of the Hamilton County court case, on December 18, 2008, LNS and GE entered into a Consent Arbitration Award in favor of GE and a forbearance agreement ("Forbearance Agreement"). Exhs. PX-77, PX-78.

25. The amount of LNS's SOT balance as confirmed in the Forbearance Agreement was $342,182.90. Exh. PX-77 at ¶ 2.

26. GE had terminated LNS's floor plan as a result of LNS's default. GE agreed to reinstate the credit line as consideration for LNS's adherence to the terms of the Forbearance Agreement. Exh. PX-77 at ¶ 6A.

27. The terms of the Forbearance Agreement included a Consent Judgment which GE could enforce against LNS in the event LNS breached the terms of the Forbearance Agreement. Exh. PX-77 at ¶ 5.

28. The Forbearance Agreement also included an SOT balance repayment schedule covering the period November 2008 through October 15, 2009, whereby LNS would repay GE the amount LNS had realized for SOT.  Exh. PX-77 at ¶ 3.  Failure to adhere to the repayment schedule would constitute a default and result in termination of the Forbearance Agreement.

29. Rudholm of Regal knew about the existence of the Forbearance Agreement, but not the details of LNS's financial situation which led to the Forbearance Agreement. Rudholm testified that the Forbearance Agreement did not mean to him that a dealer was necessarily in bad economic shape; rather, GE had "changed the rules" in the face of the global economic crisis and had begun enforcing rules it had not previously enforced.

30. Stenger of Regal would consider an SOT balance of $342,182.00 to be a serious matter and a financial red flag.  However, he testified that Regal would continue a relationship with a dealer operating under a forbearance agreement with a lender and rely on the lender to monitor the situation.

31. There is no evidence that Regal knew at the time LNS entered into the Forbearance Agreement that LNS had sold boats out of trust.  Williams testified that Regal knew of the "problem" he had with GE that led to the Forbearance Agreement and of the Forbearance Agreement itself, but he did not know if Regal was aware of the details of his financial situation and no individual from Regal testified that he knew the specifics of Williams' financial circumstances.

32. Customers who purchased a Regal boat could be negatively impacted if a Regal dealer went out of business.

**D. The aborted model year 2007 Regal boat deal with LNS**

33. Plaintiff began shopping for boats in 2009 by attending boat shows in Cincinnati and Florida to research the quality of different manufacturers, dealerships and boats and to determine the type and size of boat he wanted as well as the equipment for the boat.

34. In the course of researching boats, plaintiff also visited dealerships and picked up their brochures and literature to read about available boats and options.

35. One of those dealerships was LNS, which plaintiff first visited in April of 2009. While there, Williams provided plaintiff with Regal brochures and literature.

36. Plaintiff had no direct contact with any Regal employee before April of 2009. He had only read Regal brochures, which asserted that customer satisfaction was Regal's primary objective, and he liked Regal's mission statement and the company's boats.

37. Regal's mission statement contained in the Regal brochures "seemed to be a little more sincere" to plaintiff. In particular, the following statement in Regal's 2009 brochure gave plaintiff assurance that Regal was a reputable company with which to deal: "With God's help and a steadfast commitment to integrity, we will develop a team of exceptional people and relationships to provide exceptional customer satisfaction." Exh. PX-1A.

38. In the course of researching boats and reviewing the Regal brochures, plaintiff highlighted the following words in a brochure section entitled "Legacy of Commitment": "As the current stewards of the Regal brand, we are fully committed to the legacy and founding principles of Regal, and understand that owners' satisfaction is the single greatest charge we have. We are grateful for your business but even more appreciative of the opportunity to exceed your expectations during your ownership

experience." Exh. PX-1A.

39. Plaintiff visited LNS in mid-April 2009 and attempted to purchase from LNS a 2007 Regal 3350 boat in LNS's inventory.  According to plaintiff, he reached a deal with LNS and returned the following day with a check to purchase the 2007 boat at the agreed upon price.  Williams was not present when plaintiff came to LNS but Williams' son was there and gave plaintiff the paperwork for the deal, which inflated the agreed-upon price by $10,000.00.  Plaintiff spoke with Williams on the phone about the price, which Williams would not change.  Plaintiff refused to purchase the boat at the inflated price and left without closing the deal.

40. Williams testified that he did not recall plaintiff being upset when he came to purchase the boat.  Rather, Williams testified that there was never an agreement on a 3350 boat because plaintiff kept changing his mind as to what he wanted.  Williams' testimony on this point is not credible.  Williams' testimony regarding the transaction was very vague, and although Williams purportedly recalled that plaintiff changed his mind regarding his choices for the boat, Williams provided no specifics regarding the parties' negotiations.

41. The failed boat deal raised a red flag for plaintiff about LNS.

## E. Plaintiff's April 2009 encounter with Regal

42. Following the failed deal, plaintiff continued to search for a boat and visited several dealers in the Lake Cumberland area.  He did not return to LNS around that time.

43. After the deal for the model year 2007 Regal boat fell through, plaintiff had his first encounter with a Regal representative.  Regal Regional Sales Manager Rudholm telephoned plaintiff in April 2009 and persuaded plaintiff to give LNS and Regal

another chance to gain his business.  Rudholm told plaintiff that Williams had asked Rudholm to call plaintiff on Williams' behalf.  Rudholm testified at trial that he first learned of plaintiff's interest in a Regal boat from an individual named David Hewlett at a dealership called Hilltop Marine.

44. Plaintiff told Rudholm that he was disappointed in Williams and did not want to return to LNS.  Rudholm assured plaintiff that LNS had been a reputable Regal dealer for a number of years and that plaintiff would not regret buying a Regal boat through LNS. Rudholm assured plaintiff that LNS was capable of servicing plaintiff and putting a deal together.

45. To persuade plaintiff to keep his business with LNS, Rudholm told plaintiff about Regal's mission statement and that customer satisfaction was Regal's top priority. Rudholm spoke about Regal's J.D. Power awards, and he told plaintiff that Regal boats were top quality and that a Regal boat would be a good fit for plaintiff's needs. Rudholm also told plaintiff that Regal could service his boat, plaintiff would receive a quality boat, and his experience would exceed his expectations.

46. Rudholm asked plaintiff if he would reconsider talking to Williams, and plaintiff responded that he would do so if the occasion arose and there was a boat that fit his needs.

47. Rudholm knew as of April 2009 that LNS had a forbearance agreement with floor plan lender GE, but he did not tell plaintiff about the agreement.

48. In the spring of 2009, LNS was in general compliance with the Forbearance Agreement.   As of April 2009, Clement, Regal vice-president of material and customer support, had received no red flags from the service side of LNS for the 2008-

09 time period.

49. During 2009, GE had sent a financial audit team to LNS every 90 days. Throughout this time period, Regal was building boats for LNS to sell. GE was approving LNS credit on Regal boats manufactured during this time period.

50. According to Stenger, if a dealer is in forbearance, Regal would continue its relationship with the dealer and expect the lender to monitor the situation; if the floor plan lender is continuing to extend credit, then Regal is obligated to continue to do business with the dealer.

51. Rudholm believed that when he talked to plaintiff about buying a boat in April 2009, there was nothing he needed to discuss with plaintiff about LNS's financial position. Rudholm trusted GE's lead in determining whether LNS was financially capable of staying in business, and GE was still financing boats for LNS at that point in time. Further, although LNS had a forbearance agreement with GE at the time Rudholm spoke with plaintiff, Rudholm testified that every other dealer in the boating industry likewise had a forbearance agreement during that time period given the economic conditions in the industry.

52. LNS had a fairly high "Customer Satisfaction Index" score as measured by an independent marine industry standard in April 2009 through August 2009.

53. As of April 2009, Rudholm believed it to be true that Regal built good boats and stood behind its boats.

54. Plaintiff was persuaded to continue talking with LNS again after the failed model year 2007 boat deal because plaintiff trusted Rudholm, plaintiff thought he was a nice individual, and plaintiff thought his comments were sincere.

55. Plaintiff had no conversations with anyone at Regal after the April 2009 conversation through August 11, 2009.

**F. The 2008 boat purchase and dispute**

56. Following his conversation with Rudholm in April 2009 until the end of August 2009, plaintiff explored buying a Regal and other manufacturers' boats from other dealers. During this time frame, Williams at LNS communicated with plaintiff by email and phone about different types of boats and plaintiff discussed these boats with Williams.

57. Plaintiff told Williams that he had shopped at a number of dealers around the country and did not know exactly what he wanted in a boat. Plaintiff told Williams he was looking at manufacturers other than Regal and was researching various boats.

58. On July 31 and August 3, 2009, plaintiff and Williams discussed various Regal 3760 boats that plaintiff might be interested in purchasing. Exhs. PX-4, PX-5.

59. Williams and plaintiff then discussed a model year 2008 Regal 3760, a 38-foot boat with no hours on the engine.

60. Williams informed plaintiff that the Manufacturer's Suggested Retail Price ("MSRP") for the boat was $357,000.00 and the sale price was $219,000.00. Plaintiff does not know how Williams arrived at the MSRP.

61. On August 10, 2009, plaintiff agreed to a sales price of $215,000.00 plus tax and fees ($230,345.00) for the model year 2008 Regal 3760, a 38-foot boat, hull number RGMTA355H708, short hull number TA 355 (the "2008 boat"). *See* Exh. PX-8. Plaintiff gave LNS a $10,000.00 deposit on the boat after viewing pictures of it.

62. Williams formulated a sales agreement which included a breakdown of the equipment on the boat. Exh. PX-10.

11

63. Plaintiff delivered to Williams a check in the amount of $220,345.00 dated August 11, 2009, for final payment on the 2008 boat. Exh. PX-9.

64. Before writing the check and handing it to Williams, plaintiff took Williams at his word that the MSRP was $357,000.00. Plaintiff did not check the price on the internet. Plaintiff testified that he trusted Williams at this point.

65. When the 2008 boat arrived, plaintiff requested documentation from Williams regarding the MSRP.

66. Plaintiff claims that on multiple occasions prior to putting his deposit down and making final payment on the boat, he requested that Williams provide him with written verification of the quoted MSRP and a "build sheet," which is a document that identifies the specifications, equipment, and other features of the boat and adds up to the MSRP total. Plaintiff testified that he did not have a problem with paying for the boat before he saw the build sheet but he wanted documentation of the deal, including a list of the cost of the equipment and the MSRP, before plaintiff cashed his check. Plaintiff did not obtain the build sheet and MSRP before Williams cashed the check.

67. Plaintiff testified that he paid Williams in full before obtaining the MSRP and build sheet because Williams told plaintiff if he did not pay him in full someone else was going to buy the boat.

68. Plaintiff first requested the factory build sheet in writing from Williams by email dated August 19, 2009, which read in full: "Factory build sheets??" Exh. PX-11. This was eight days after plaintiff had delivered final payment on the 2008 boat.

69. When Williams did not provide the information plaintiff requested, plaintiff called Rudholm, who provided information to plaintiff the next morning showing an MSRP

of $316,00.00.

70. At this point, following the failed deal involving the model year 2007 Regal boat and after Rudholm had given plaintiff the correct MSRP showing that Williams had inflated the cost of the model year 2008 boat by $40,000.00, plaintiff believed that Williams was not reputable and plaintiff did not trust him.

71. Plaintiff contacted Williams and proposed that Williams sell the 2008 boat, take his commission, and give plaintiff the rest of his money back, which plaintiff expected would be approximately $210,000.00.

72. Williams sent an email to plaintiff on August 21, 2009, concerning their conversations regarding the proposed resale of the 2008 boat and asked plaintiff for his thoughts on the matter. Exh. PX-12.

73. On August 23, 2009, plaintiff told Williams in an email not to title the 2008 boat until he decided if he was going to accept it and said that Williams still had not provided him with the factory build sheet, which he asked Williams to forward to him. In response, Williams said Regal did not have the build sheet plaintiff was referring to and that Williams had listed the boat for $225,000.00 and called some prospective purchasers as plaintiff had suggested (apparently in an effort to sell the boat to a third party). Exh. PX-13.

74. Plaintiff emailed Williams on August 28, 2009, stating he had not received any documentation from Williams identifying the cost breakdown for the boat and questioning the MSRP Williams had provided based on information provided by other Regal dealers. Exh. PX-15.

75. Williams provided plaintiff with the sales invoice on the 2008 boat, which Williams

had signed but plaintiff had not.  Exh. PX-10.

76. Williams testified that when the boat arrived, plaintiff did not like the appearance of the boat and wanted a joystick control and a feature known as a through-hull exhaust.

77. Plaintiff testified that he was dissatisfied with his purchase of the 2008 boat because he believed Williams had quoted an MSRP for the boat that was inflated by $40,000.00 (*see* Exh. PX 88 at Regal 000032), and plaintiff received a smaller discount on the purchase price of the boat than he believed he would get ($80,000.00 versus $120,000.00).

78. Williams and plaintiff disputed who would take ownership of the 2008 boat, which had been shipped from Regal and was at LNS.  No one from Regal was involved in the dispute initially.

79. Plaintiff's counsel wrote a letter to Williams on August 25, 2009, in which counsel stated that plaintiff was not pleased when he received pictures of the 2008 boat and that plaintiff confirmed his displeasure with the boat upon inspection after it was delivered to LNS's warehouse because he suspected it was a repossessed boat.  Exh. DX-8.  The letter makes no mention of the MSRP or of plaintiff's concerns with the pricing of the boat.  Counsel stated that plaintiff did not want to accept delivery of the boat because it appeared likely it was a re-possession and not a delivery from a dealer. *Id*.

80. Plaintiff testified that other than the issue with the MSRP, there was no issue with the 2008 boat of which he was aware.

81. When plaintiff learned the true MSRP for the 2008 boat, he believed Williams was "not reputable" and he did not trust him.

82. Other than providing the MSRP, Regal was not involved in any of the discussions between plaintiff and Williams about the sale of the 2008 Regal boat or the MSRP.

83. As of September 8 and 9, 2009, it was Regal vice-president Stenger's understanding that plaintiff was unhappy with the 2008 boat because of the MSRP issue, the color of the boat, and the absence of a joystick.  Plaintiff testified that "[t]o [his] knowledge" he never talked about color combination and lack of power in the boat with Stenger.

84. Plaintiff's testimony regarding the reason for his dissatisfaction with the 2008 boat purchase is not fully credible.  Plaintiff, an experienced and sophisticated businessman, testified that the MSRP is critical to a deal such as the boat purchase because an individual bases his deal on the MSRP and it is the benchmark for the purchase price.  Thus, one would reasonably expect that plaintiff would obtain verification of the MSRP before making payment on the boat, particularly because plaintiff knew there was reason to be cautious when dealing with Williams in light of Williams' attempt to inflate the purchase price of the 2007 boat.  Plaintiff, however, testified that he took Williams at his word, made a deal with Williams, and paid the entire amount due on the boat before obtaining verification of the MSRP, the critical component of the deal.  In view of these circumstances, and in light of the failure by plaintiff's counsel to document the MSRP issue in his August 25, 2009 letter to Williams outlining plaintiff's concerns with the 2008 boat deal and focusing on plaintiff's displeasure with the boat after he viewed it (Exh. DX-8), plaintiff's testimony that the only issue he had with the 2008 boat deal was the inflated MSRP is not credible.

### G.  The settlement negotiations

85.  LNS entered into settlement negotiations with plaintiff to reach a resolution regarding the 2008 boat.  In order to resolve the dispute over the boat, plaintiff suggested to Williams in August 2009 that Williams sell the 2008 boat, that Williams receive a sales commission, and that Williams refund to plaintiff $210,000.00 of the $230,000.00 purchase price for the boat.

86.  By August 2009, plaintiff believed that LNS had received an "F" rating from the Better Business Bureau ("BBB"), and plaintiff had seen complaints about LNS's deceptive practices related to warranty, sales and services on the internet.  Many matters raised red flags for plaintiff about LNS, and as far as he could tell LNS was in a great deal of financial trouble.  Plaintiff was suspicious of Williams.

87.  The negotiations between plaintiff and Williams were ongoing as of late August 2009, at which time plaintiff called Rudholm at Regal and told him that he and Williams had reached an impasse over how to handle the 2008 boat.  Plaintiff testified that when plaintiff explained the idea of Williams selling the boat and keeping a commission, Rudholm said that probably would not happen.  Plaintiff contends that Rudholm explained that even if Williams sold the boat to a third party, plaintiff would not receive his money back on the boat.  According to plaintiff, Rudholm explained that the only option plaintiff had to make himself whole was to let Williams sell the 2008 boat, keep the commission, and apply the proceeds from the sale toward a new boat for plaintiff.  Plaintiff, however, continued to explore the option with Williams of selling the boat to a third party.

88.  Plaintiff testified that in August 2009, Rudholm told him that LNS had no money.

Rudholm testified that he believed LNS was in good financial standing at that time.

89. As of September 4, 2009, while the dispute over ownership of the 2008 boat was ongoing, plaintiff had conveyed to Regal his opinion that LNS was not going to survive and its building was for sale, and that LNS had received poor reviews on the BBB and Dunn and Bradstreet sites. Exh. PX-16. Plaintiff also believed that LNS was disreputable. According to plaintiff, Rudholm had indicated to him that LNS was having problems.

90. Plaintiff sent a number of emails to Rudholm and Stenger about the 2008 boat situation. Stenger responded to plaintiff on September 8, 2009, by email stating: "I have reviewed the emails you sent. I believe the best course of action would be to have Mark [Williams] sell the 3760 and put you into a new one just the way you want it. It appears that Mark [Williams] is willing to work with you to make this happen." Exh. PX-17.

91. The following day, plaintiff and Williams exchanged emails regarding a settlement deal. Plaintiff told Williams that his previous offers to sell the boat on plaintiff's behalf were not acceptable because plaintiff did not own the boat. Plaintiff suggested to Williams that he either: (1) sell the boat, take his commission, and give plaintiff the balance, or (2) arrange a deal on a "properly equipped" 2010 boat that allowed plaintiff to pay a reasonable and fair difference. Exh. PX-18.

92. Rudholm did not get involved in the parties' impasse until September 23, 2009, and when he did get involved it was at the request of plaintiff. Exh. PX-19 at PLF 99. In an email he sent to plaintiff and Williams on that date, Rudholm outlined the beginning of a framework for a settlement agreement on the 2008 boat. *Id.* Rudholm

noted that plaintiff's objective was to sell the boat and he made no mention of exchanging the 2008 boat for a new boat. His only "strong recommendation" was that someone should obtain insurance on the boat.

93. Plaintiff's testimony that Rudholm told him he would not receive his money back if Williams sold the 2008 boat to a third party is not credible. Plaintiff offered no reasonable explanation as to why, even if Williams was experiencing financial problems and had no cash on hand, he would be unable to refund to plaintiff his money from any proceeds of the sale of the 2008 boat to a third party. Further, the evidence shows that plaintiff and Williams pursued this option throughout the negotiation process, even after plaintiff contacted Rudholm about the impasse he and Williams had reached in their negotiations. The August 21, 2009 email Williams sent to plaintiff discloses that Williams and plaintiff had been discussing resale of the 2008 boat, and Williams proposed refunding the price of the boat less a brokerage fee and certain other costs to plaintiff. Exh. PX-12. As late as October 13, 2009, plaintiff continued to pursue the option of Williams selling the 2008 boat and returning the money to him. Exh. PX-21 at PLF 171. Moreover, none of the numerous emails Williams and plaintiff exchanged on this matter indicated that a sale of the boat and a refund of plaintiff's money was not feasible. Finally, the proceeds of the sale of the 2008 boat were applied toward the 2010 boat, and plaintiff offered no reasonable explanation at trial for why payment of those proceeds directly to him was not an equally feasible option.

94. After Rudholm sent his initial September 23, 2009 email, he conducted many joint and individual phone conferences with the parties in an effort to get them on the same

page regarding a settlement on the 2008 boat. Exh. PX-26. Both plaintiff and Williams considered Rudholm's role in the settlement negotiations to be that of "mediator" between plaintiff and Williams, and Rudholm's involvement was essential to plaintiff entering into a settlement deal with LNS. The actual deal that was ultimately reached was between LNS and plaintiff.

95. By email dated October 13, 2009, Williams provided plaintiff with a price quote for a new model year 2010 Regal 3760. Exh. PX-20.

96. In an email dated October 22, 2009, Rudholm informed plaintiff and Williams that he had spent over three hours on the phone with the parties, and he set forth the proposed financial structure and terms of an agreement. Exh. PX-26. Rudholm copied Stenger on the email.

97. Later that same date, plaintiff sent an email to Williams clarifying some misunderstandings Rudholm had about the financial aspects of the deal. Exh. PX-27 at PLF 102-103. Plaintiff copied Rudholm on the email.

98. Rudholm, plaintiff and Williams had a conference call during the settlement process to resolve issues which included taxes and rebates.

99. On November 17 and 18, 2009, plaintiff and LNS executed a settlement agreement and release ("Settlement Agreement"), whereby LNS placed an order on behalf of plaintiff with Regal for a model year 2010 Regal 3760 boat (Hull Identification Number RGMTA426B010, short hull number TA 426) (the "2010 boat"). Exh. PX-32. Regal was not a party to the Settlement Agreement.

100. Plaintiff signed the Settlement Agreement on November 18, 2009, after reading it and reviewing it with his attorney, who was satisfied with the Settlement Agreement.

Exh. PX-32 at PLF 251.

101. Under the terms of the Settlement Agreement, Williams was to sell the 2008 boat for
not less than $198,000.00, and that amount was to go to Regal towards payment for
the 2010 boat. Proceeds in excess of $198,000.00 were to be divided between the
parties pursuant to a brokerage agreement, with LNS receiving 66.67% and plaintiff
receiving 33.33%. Exh. PX-32 at ¶¶ 5, 6.

102. The Settlement Agreement included the following release provisions at ¶¶ 13 and 14:

> It is the intention of the Parties in executing this Agreement that this
> Agreement shall be effective as a full and final accord and
> satisfaction and general release from any and all matters arising
> from, based upon or related to the Purchase of the 2008 Regal 3760,
> its sale by Land N Sea and the subsequent purchase by Risner of the
> 2010 Regal 3760.
>
> The Parties hereby fully release and forever discharge one another
> and their respective insurers, predecessors, successors, heirs,
> assigns, associates, affiliates, parent and subsidiary corporations,
> owners, stockholders, partners, attorneys, representatives, agents,
> officers, directors and employees, past, present and future, from and
> on account of any and all claims, demands, actions, causes of action
> or charges in favor of either party which in any way relates to or
> arises from or in connection with the subject Purchase of the 2008
> Regal 3760, its sale by Land N Sea and subsequent purchase by
> Risner from Land N Sea of the 2010 Regal 3760.

Exh. PX-32.

103. The Settlement Agreement also includes an integration clause at ¶ 18 stating that the
Settlement Agreement "contains the entire agreement and understanding between
the Parties concerning the subject 2008 Regal 3760, its sale by Land N Sea and the
subsequent purchase by Risner from Land N Sea of the 2010 Regal 3760." Exh.
PX-32.

104. By signing the Settlement Agreement, LNS intended to resolve all issues involving

20

the 2008 boat and the 2010 boat.

105. Plaintiff had no communication with Regal after the parties reached the Settlement Agreement in November of 2009, during the manufacturing process, and prior to the delivery of the boat to LNS on May 20, 2010.

## H. LNS's financial difficulties

106. Williams had been in general compliance with the Forbearance Agreement from the time it was executed in December 2008 through the end of the 2009 boating season.

107. Around February 2010, LNS faced a financial crisis. In a letter dated February 25, 2010, Williams informed Regal of financial problems LNS was experiencing. Exh. PX-79. Williams informed Regal that the entire amount of the SOT balance LNS owed GE had been repaid and that its Forbearance Agreement with GE had been extended past March 1, 2010, but that GE had suspended LNS's line of credit until the funds on the short sale of a boat were paid in full. Williams sought assistance from Regal including a loan/advance from Regal of $60,000.00, of which $15,000.00 would go toward making Williams current on his taxes.

108. A few days after the letter, Williams, Kuck and Stenger had a face-to-face meeting in Florida during which Williams requested assistance, including rebates from Regal. Williams sent a proposal for assistance to Stenger after the meeting. Exh. PX-80. Regal did not provide the requested financial assistance but did speed up its rebate program.

109. Despite the information provided by Williams, Rudholm testified that he believed LNS was in good financial standing until June 2010 because GE had audited LNS's books 60 to 90 days prior to June 2010 and LNS passed the audit. Rudholm knew

as of February 2010 that LNS was experiencing financial difficulties, but he

testified that he relied on GE to monitor LNS's finances.

110.    LNS continued as a Regal dealer until July 14, 2010, when Regal's counsel, Brooks

Rathet, notified counsel for Williams that Regal was invoking the right to terminate

the SSA because LNS had sold inventory out of trust.  Exh. PX-85.  According to

Kuck, the primary reason Regal terminated LNS as a dealer as of that date was

because GE had notified Regal it was terminating LNS's floor plan, without which

LNS had no way forward.  LNS stayed in business for six months following the

termination letter, finally ceasing operations in December 2010.

## I.  The manufacture of the 2010 boat

111.    Regal accepted the sales order for the 2010 boat as an order to be financed through

the floor plan lender, GE.  Exh. PX-89.  Regal subsequently received a credit

approval number from GE.  Exh. PX-89A at 7.  According to Stenger, this meant

that GE had agreed to fund plaintiff's boat in accordance with the terms stated on

the shipper's invoice and that plaintiff would receive the boat, which he in fact did.

112.    Pursuant to the Settlement Agreement, delivery of the 2010 boat was anticipated on

or before April 1, 2010, subject to availability from Regal and delays beyond the

control of LNS.  Exh. PX-32 at PLF 248.

113.    In January 2010, plaintiff and Williams exchanged communications and finalized

the features and interior colors of the 2010 Regal 3760 boat Regal would

manufacture.

114.    In late January, Regal pressed Williams for plaintiff's selections, stating it was

ready to proceed with the scheduled manufacture of the boat.  Exh. PX-90 at Regal

000078.

115. In response, Williams asked Regal if the delivery date could be moved back to middle or late April because that delivery time frame would work best for him. Exh. PX-90 at 000078. Regal stated that was a problem because the boat was scheduled for manufacture, the date had already been moved back once or twice, and Regal understood it would be able to build the boat as soon as possible under the deal that had been reached between Williams and plaintiff. Exh. PX-90 at Regal 000077. Williams then submitted plaintiff's color and option selections.

116. Plaintiff chose white vinyl and two-tone beige for the cockpit interior and lava rock for the kitchen galley. Exh. PX-33.

117. The planned finish date for the 2010 boat was March 17, 2010. According to the Regal hull file, the 2010 boat was "yellow tagged" on March 17, 2010, meaning it was near the end of production but was not yet ready to be shipped due to a defect or back-ordered part. The boat was "white-tagged," meaning that it was cleared to be shipped, on April 12, 2010, following a change order.

118. By email dated April 2, 2010, Williams advised plaintiff that he had scheduled the boat for pick-up by April 14 and that it would then be prepped and sent to Lake Cumberland by month's end. Exh. PX-36.

119. Between April and May 2010, plaintiff continued to communicate only with Williams at LNS regarding the status of the boat.

120. On May 17, 2010, the boat left Orlando, Florida, and Regal transferred the 2010 boat to LNS as indicated by the Manufacturer's Statement of Origin ("MSO") (Exh. PX-69) and the boat arrived at LNS in Cincinnati, Ohio, on May 20, 2010. This

was approximately one month after payment in full had been made by plaintiff and over one month after the boat was white-tagged for delivery. Plaintiff did not communicate with Regal about the delay, and the delay was not attributable to Regal.

121. As a general proposition, a boat does not leave Regal's facility until it is paid in full.

122. Plaintiff paid no money directly to Regal for the 2010 boat. Pursuant to the Settlement Agreement, $198,000.00 of the proceeds of the sale of the 2008 boat went toward the purchase of the 2010 boat. Exh. PX-32. In April 2010, plaintiff made a final payment of $54,215.00 for the boat by check made payable to LNS. Exh. PX-39.

123. The 2010 boat was covered by Regal's "Limited Warranty," which includes a "Limited General Warranty" and several other types of limited warranties. Exh. DX-93.

124. The Limited General Warranty states:

> In addition to above Hull warranties, Regal warrants to the original purchaser of this boat if purchased from an authorized Regal dealer, that the dealer or Regal will repair or replace any parts found to be defective in materials or workmanship for a period of one (1) year from the date of delivery, subject to all exceptions, limitations and conditions contained herein.

Exh. DX-93.

125. The Limited Warranty includes a number of exceptions, including "[a]ccessories and items which were not part of the boat when shipped from the Regal factory," "loss of time," and "inconvenience." Exh. DX-93.

126. The Limited Warranty also includes customer obligations that are conditions

precedent to the availability of any benefits thereunder.  Exh. DX-93.

127.  Only the Customer Service Manager of Regal can waive the terms, conditions, limitations and disclaimers in the Limited Warranty, and any such waiver must be in writing.  Exh. DX-93.

128.  The Limited Warranty states in all capital letters:

> General Provisions:  All general, special, indirect, incidental and/or consequential damages are excluded from this warranty and are totally disclaimed by Regal.  It is the interest of the parties that the owner's sole and exclusive remedy is the repair or replacement of the vessel or its allegedly defective component parts and that no other legal or equitable remedies shall be available to said owner. Some states do not allow the exclusion of incidental or consequential damages so the exclusion of incidental or consequential damages may not apply to you.  This is a limited warranty; Regal makes no warranty, other than contained herein; to the extent allowed by law any warranties of  merchantability or fitness for a particular purpose arising in state law are expressly excluded to the extent allowed by law, any implied warranty of merchantability is limited to the duration of this Limited Warranty. All obligations of Regal are specifically set forth herein.  Regal does not authorize any person or dealer to assume any liability in connection with Regal boats. . . .

Exh. DX-93.

129.  The Limited Warranty also states: "Regal's obligation with respect to this warranty is limited to making repairs to or replacing the defective parts and no claim for breach of warranty shall be cause for cancellation or rescission of the contract or sale for any boat manufactured by [Regal]."  Exh. DX-93.

130.  By May 20, 2010, following delivery of the boat to LNS, Williams had informed plaintiff that there were two issues with the boat: (1) the EVC (electronic vessel torque control), which was a joystick-type option on the boat, did not work, and (2) the interior upholstery colors were not correct.  The EVC is a second guiding

system for the boat, without which the boat can be guided manually. Plaintiff is capable of guiding a boat manually and safely without the EVC system. The EVC system was meant more for plaintiff's wife.

131. As of May 2010, the EVC system and the cockpit colors were the only physical problems with the boat of which plaintiff was aware, although the boat had not yet been placed in the water. It was still at LNS, and plaintiff and LNS were "going back and forth" about repairs and who would assume responsibility for them.

132. By May 30, 2010, plaintiff had reported to Rudholm via emails to Williams that LNS had ordered the wrong upholstery color for the cockpit interior, which was not Regal's fault and was not a warranty issue. Plaintiff had also spoken to Rudholm on the telephone about the issue. The seats were not covered by Regal's warranty. Regal had also been advised in a June 2, 2010 email that Williams had agreed to make adjustments to the interior. Exh. PX-45 at PLF 55.

133. Plaintiff also spoke to Rudholm about the EVC system after the boat came in. Ruhdolm told plaintiff that a Volvo representative would have to address that issue.

134. Due to some delays with the boat, Williams told plaintiff that he would add trim tab indicator lights and gasoline for the boat at no additional cost to plaintiff.

135. Plaintiff initially informed Williams on June 2, 2010, that changing the seating in the cockpit area and on the Europad interior (the sun pad on the back of the boat which constitutes approximately one-quarter of the total interior) would be very expensive and time consuming; therefore, plaintiff did not consider that to be a viable option under the circumstances. Plaintiff informed Williams that he would assume responsibility for adding two-tone vinyl trim to the seats and Europad at a

later time.  Exh. PX-45 at PL 54.

136.  In that same email, plaintiff stated that in exchange, he thought it would be reasonable for Williams to refund the cost of some extra items; include the extra handrails that had been ordered, with plaintiff to approve their location before they were installed; provide a full tank of gas for the boat; provide a knowledgeable Regal representative to meet with him at Conley Bottom to give him an orientation; change the Europad to white vinyl; install trim tab indicator lights; and reinstate the extended warranty program that was initially offered.  Exh. PX-45 at PLF 54.

137.  Plaintiff did not copy Regal on this email to Williams, and Regal was not involved in the negotiations between plaintiff and Williams at this point.

138.  Tom Diekmeyer, LNS's service manager, sent an email to plaintiff dated June 15, 2010, asking plaintiff if LNS was to deliver the 2010 boat to Conley Bottom at Lake Cumberland that week.  Exh. PX-47 at PLF-201.

139.  Plaintiff told Diekmeyer in response that he did not want to take possession of the boat until Williams had given him a clear summary of what was "going to be done to make it right."  Exh. PX-47 at PLF 201.

140.  Diekmeyer cancelled the delivery that same date in response to plaintiff's directive that he did not want to take delivery of the boat.  Diekmeyer asked plaintiff what LNS was supposed to be getting done and told plaintiff that the interior seating was in the hands of Regal.  Exh. PX-47 at PLF 200.

141.  Plaintiff responded by email later that same date.  Plaintiff said that LNS had offered to install extra handrails he had requested; add trim tab indicator lights; include 100 gallons of fuel; and replace the Europad seating materials with the

factory materials originally ordered. Plaintiff stressed that he had bought the boat from LNS, not Regal, and he expected to get a straight answer from LNS instead of being told that the matter was in Regal's hands. Plaintiff wrote: "Please don't tell me it is in Regal's hands . . . . I DIDN'T BUY THE BOAT FROM REGAL. . . . I BOUGHT A REGAL BOAT FROM LANDNSEA!!" Plaintiff copied Rudholm and Stenger on his response. Exh. PX-47 at PLF 199-200.

142. The next day, June 16, 2010, Diekmeyer responded by informing plaintiff that the trim tab indicator lights had been installed since June 14, 2010; he would install the handrails when plaintiff gave instructions on where to place them and Diekmeyer needed to know the length; there were 40 gallons of fuel in the boat and the boat would be fully fueled when the boat neared the boat slip area; and Diekmeyer had no control over the seating issue, which Regal and Williams would have to handle. Exh. PX-47 at PLF 199.

143. Plaintiff explained in his testimony at trial that there was a misstatement in his communications with Diekmeyer and his intent as of June 15, 2010, was that LNS would install the extra handrails, add the trim tab light indicators, and add one hundred gallons of fuel, in exchange for which plaintiff would replace the Europad and cockpit upholstery as he had indicated in his June 2, 2010 email to Williams. Exh. PX-45 at PLF 54.

144. Despite plaintiff's intention to resolve the interior upholstery issue himself, plaintiff sent an email to Diekmeyer on June 16 informing Diekmeyer that he expected LNS to take care of the upholstery issue in addition to these other matters. Plaintiff questioned why he was just now hearing about the trim tab indicators which had

been installed two days earlier; he questioned why there was an issue as to the length of the handrails and instructed Diekmeyer to call him when the handrails were in his shop so that plaintiff could come and show him where to position them on the boat; and plaintiff told Diekmeyer that he wanted an answer the following day about when the cockpit and Europad upholstery would be corrected and the boat would be ready for delivery, stressing that he did not want Diekmeyer to tell him the interior problem was in Regal's hands because plaintiff did not buy the boat from Regal. Exh. PX-47 at PLF 199.

145. Plaintiff sent an email to Williams on June 20, 2010, which he copied Diekmeyer on, asking Williams to summarize in writing what he had done or would be doing to make the boat "right" in accordance with the order specifications and concessions Williams had agreed to make to account for the delay caused by the upholstery issues in the cockpit and Europad areas. Plaintiff stated that assuming they were in agreement, he wanted the boat delivered to Conley Bottom on Friday, June 25, 2010. Exh. PX-48.

146. On June 21, 2010, Williams informed plaintiff that he would be responsible for swapping out the cockpit upholstery to tan and white and the Europad to white vinyl. Plaintiff gave his assent if Regal was willing to send the materials. Plaintiff's expectation was that Regal should manufacture new interior seats at its cost and ship them to Williams to replace the seats with the incorrect finishes in the 2010 boat. Exh. PX-49.

147. Plaintiff testified that he verbally discussed with Rudholm in June 2010 changing out the interior at Regal's cost, but his testimony is not credible because all of his

29

other communications were in writing and he specifically told LNS the interior was not Regal's issue.

148.    On June 22, 2010, GE sent a letter to Williams notifying him that it would conduct a records review to determine LNS's financial position.  Exh. PX-81.

149.    On June 22, 2010, plaintiff sent an email to Williams demanding to know if he was going to deliver the boat by June 25, insisting that he deliver the boat, and informing Williams that plaintiff would have to trust him to change out the interior later.  PX-50.

150.    On June 24, 2010, Williams sent a letter to Kuck at Regal outlining LNS's financial difficulties with GE, including GE's cancellation of his line of credit.  Williams informed Kuck that LNS had submitted to voluntary repossession of its inventory.  Williams requested that Regal give him 90 days to acquire funding and a credit line to sustain operations, which meant that he was requesting "provisional dealer status" pursuant to which he would be permitted to maintain his dealership without a floor plan in place. Exh. PX-83.

151.    Around June 23 or 24, 2010, the same date Kuck received the letter from Williams informing Regal that GE had terminated LNS's floor plan, Rudholm telephoned plaintiff and warned him that he should remove the 2010 boat from LNS or risk losing it because LNS was having financial issues with GE and GE was repossessing inventory at LNS.  Plaintiff testified that he thought Rudholm was "an honest man" who "was trying to do the right thing" and was the only person from whom plaintiff could get a straight answer.  Plaintiff thought Rudholm's intent was good and that if Rudholm had not looked out for plaintiff's interests his boat would

have been repossessed by a bank.

152. In an undated email, Kuck responded to Williams' June 24, 2010 letter and stated that Regal was not in a position to grant Williams' request to hold the Cincinnati market open for a 90-day period and that Regal would be looking for another dealer in the Cincinnati market. Exh. PX-83 at PLF 333-334. Stenger also responded to Williams by an undated email on behalf of Kuck and advised him that although Regal had granted some dealers who were without a current floor plan the ability to continue on a "provisional" status, those dealers did not have an SOT situation that required Regal to repurchase the inventories and sell them at a loss. *Id*. at PLF 335. Stenger noted that under Regal's SSA, no cure period "shall" be provided if a dealer is in default or SOT, so that LNS's SSA was terminated. *See* EXH PX-76 at ¶¶ 8.0, 8.1(e). However, Stenger stated that Regal would give Williams every consideration if he were able to return the dealership to solvency, secure an acceptable line of credit, and develop a capable service department before Regal selected another dealership.

153. The 2010 boat was delivered to Conley Bottom on June 28, 2010.

154. LNS employee Diekmeyer sent an email to plaintiff on June 30, 2010, advising plaintiff that the boat was ready except for the EVC system. PX-54. Diekmeyer told plaintiff that the Volvo representative would be at the lake some time the following week.

155. That same date, plaintiff sent an email to Rudholm and Kuck to which he attached an email he had sent to Williams the prior day. Exh. PX-55. Plaintiff explained to Regal the issue with the incorrect cockpit and Europad upholstery colors and stated

31

that he was asking for Regal's help one more time. In the email to Williams, plaintiff recounted his frustration with Williams and with Regal and asked Williams where the title, MSO, documentation, paid-in-full receipt, and keys to the boat were. Plaintiff stated that the boat was in his slip but he did not have the paperwork he should have to title, insure, and operate it. Plaintiff also told Williams that he had paid the balance due of $54,000.00 on the boat before it was shipped to LNS in April reluctantly and against the advice of his attorney "who had already experienced your business ethics in our initial boat encounter."

156.    Rudholm responded by email that same day, informing plaintiff that he understood his frustration and heard him "loud and clear." Exh. PX-55. Rudholm told plaintiff he was in Cincinnati and planned to meet with Williams that day, after which he would share what he had discovered with the Regal team and confer with them, and then contact plaintiff regarding their options. Rudholm called plaintiff that day or the next day for a conference call with Regal Customer Service Representative Tony Mayo, Clement and another individual from the Regal organization.

## J. Post-delivery chronology of events

157.    Mayo contacted plaintiff regarding his issues with the boat via email on July 2, 2010, prior to the Fourth of July weekend. Mayo advised plaintiff that a Volvo representative would be on the boat on Wednesday morning, July 7, 2010, to address the Volvo issues; a representative from LNS would be at the boat that same morning to assist the Volvo representative and go over the boat with plaintiff; and plaintiff should notify the marina office that these individuals would be on the boat and would need to access the boat keys. Mayo further informed plaintiff that he

had shipped hand rails and boat numbers, and plaintiff should make arrangements for the trailer, which was at LNS and was to be delivered to Conley Bottom. Mayo asked for plaintiff's contact information and gave plaintiff his contact information. Exh. PX-57.

158. Plaintiff was delayed for the July 7, 2010 meeting with the Volvo and LNS representatives due to traffic and did not arrive for the appointment, which was scheduled for 2:00 p.m., until 2:15 p.m. Upon arriving, plaintiff was informed by the marina staff that the two individuals had been there but had left at 1:00 p.m.

159. According to Clement, documentation verified that Volvo reprogrammed the EVC software.

160. When plaintiff subsequently took the boat out on the water on July 10, 2010, the EVC system was working properly. Thus, within seven days after being informed of a problem with the EVC system, Regal had scheduled an appointment with a Volvo representative, a Volvo representative had gone to Conley Bottom to address the EVC issue, and the system worked properly after that date.

161. Around this same time, Mayo set up Hilltop Marine as an authorized Regal dealer at Lake Cumberland to service plaintiff's boat. The dealership was approximately 15 minutes from plaintiff's boat dock and was very convenient for him. It was not necessary for plaintiff to take the boat to the dealership for repairs; instead, Hilltop Marine would come to the boat dock to perform repairs if an appointment was scheduled over the telephone. Hilltop Marine at all times remained willing and able to make repairs to plaintiff's boat.

162. Plaintiff sent an email to Mayo, Rudholm and Kuck dated July 8, 2010, detailing

what had transpired following delivery of the 2010 boat to LNS.  Exh. PX-60.

Plaintiff expressed dissatisfaction and frustration with the service and maintenance

he had received to date and his frustration with having missed the Memorial Day

and Fourth of July boating holidays "because of [LNS's] inconsideration and

Regal's failure to do anything about it."

163.  Regal sent a representative, Dan Snyder, to perform an orientation with plaintiff at

Conley Bottom on July 10, 2010.  Plaintiff told Snyder the generator was not

functioning and the air conditioning would not operate.  Snyder created a vapor

lock in the system while performing the orientation and was unable to resolve the

problem.  He gave plaintiff some pointers on how he could make the system

operational.

164.  Following the orientation, plaintiff completed and signed a "New Boat Delivery

Checklist," which indicated only an air conditioning problem.  By signing the form,

plaintiff agreed: "We have completed a review and orientation of the boat and its

systems.  The boat is in order and functioning properly with the exception of any

items specifically noted above. . . ."  Exh. PX-62.

165.  Plaintiff also confirmed by signing the form that he had received a copy of Regal's

Limited Warranty and had agreed to its terms.  Exh. PX-62.

166.  On July 12, 2010, two days after the orientation, Mayo emailed plaintiff and stated

that he understood plaintiff had a productive day on Saturday (the day of the

orientation) and that Snyder had given Mayo some parts to ship to plaintiff.  Exh.

DX-94; Exh. PX-63.  Mayo said it was his understanding that plaintiff was not

going to be on the boat over the next few weeks and Mayo wanted to clarify where

to send the parts so that plaintiff would receive them.

167. Plaintiff stated in response: "Yes, we had a good day.  [Snyder] was very helpful and patient.  We got everything done except getting the generator running.  Dan gave me some pointers on how to get that done."  Exh. DX-94; Exh. PX-63. Plaintiff also stated if he could not get the generator to start, he would call Mayo back for service.  He gave Mayo the address where he could send the parts referenced in Mayo's email.

168. Plaintiff testified at trial that Snyder rushed through the new boat review and did not test all of the items on the check list.  Plaintiff's testimony is not credible in view of the contemporaneous email plaintiff sent to Mayo at Regal on July 12, 2010, confirming that Snyder was "very helpful and patient," reporting they had a "good day," and omitting any criticisms or negative feedback.  Exh. DX-94; Exh. PX-63.

169. In a July 16, 2010 email to Mayo, plaintiff asked if Regal would send someone to service the generator and asked Mayo about the status of the interior change out. Exh. PX-65.

170. The air conditioner/generator was covered by Regal's Limited Warranty and plaintiff could have contacted Hilltop Marine, an authorized Regal dealer, to make any necessary repairs on these parts, but plaintiff expected Regal to take care of the problems because he thought being told to contact someone else about a problem with a brand new boat was not "a good warranty" and did not fulfill Regal's promise of customer satisfaction.  He considered being told to follow this procedure "passing the buck."  Plaintiff wanted Regal to take care of problems with the boat,

including by scheduling service appointments for him, regardless of whether the problems were covered by the Limited Warranty.

171. Plaintiff could have fixed the air conditioning problem himself after Snyder performed the orientation with him, but plaintiff chose not to do so because he did not think it was his responsibility to take care of problems on a new boat which had only two hours' use on it.

172. Hilltop Marine made repairs to the generator by July 20, 2010. Regal also contacted Hilltop Marine to fix the air conditioner, and those repairs were likewise completed as of July 20. Regal followed up with Hilltop Marine to make sure the repairs were completed.

173. The only reason plaintiff did not contact Hilltop Marine for any needed repairs was because he was frustrated and not because the boat could not be fixed, Hilltop Marine refused to do the repairs, or Regal refused to pay for the repairs.

174. After delivery of the boat, plaintiff had difficulty obtaining the MSO for the boat, which typically is sent by Regal to the floor plan lender or, if the dealer has paid cash for the boat, to the dealer. GE, as LNS's floor plan lender, would not release the MSO on the 2010 boat until LNS paid the boat off, which was its typical practice.

175. Plaintiff sent emails to Williams requesting the MSO for the boat, on which he copied Regal representatives, and plaintiff explained his difficulty with obtaining the MSO to Regal representatives several times between July 6 and 16, 2010. Exhs. PX-58, 60, 61, 64, 67. On July 16, 2010, plaintiff asked Mayo what was being done to resolve the situation. Exh. PX-65.

176. According to plaintiff, as of July 20, 2010, Regal had fixed the air conditioner malfunction and the only issue that was preventing him from using the boat was the lack of an MSO, without which he testified a boat cannot be operated on the lake. Regal had not addressed the interior color issue to plaintiff's satisfaction, but that was not a Limited Warranty issue and it did not interfere with operation of the boat.

177. Even though the interior upholstery issue was not covered by Regal's Limited Warranty, Clement offered to resolve the issue at Regal's cost. Clement offered to have Regal send factory "skins," the vinyl that covered the foam and structure portion of the interior seating, to plaintiff to have the seats reupholstered by a local upholsterer at Regal's cost. Initially, plaintiff agreed with Clement's suggestion to take the boat to a local business to have the upholstery replaced with factory upholstery at Regal's expense. However, plaintiff changed his mind a week later because he had paid $284,000.00 for the boat and did not think he should have to fix it himself, and he was irritated about the MSO.

178. On July 20, 2010, Rudholm sent an email to plaintiff stating that Brian Edge at GE could assist plaintiff with obtaining the MSO and providing Edge's contact information. Exh. PX-67. Plaintiff refused to contact GE about obtaining the MSO because he did not consider it his responsibility. Rudholm agreed that it was the responsibility of the dealer to obtain the MSO. Rudholm advised plaintiff that it was in his best interest to contact GE because plaintiff could obtain his MSO from GE, whereas Regal as the manufacturer could not obtain the MSO for him.

179. Plaintiff sent an email to Kuck that same day which summarized his frustration with what plaintiff perceived to be the "poor customer service and disrespect" he had

received "from the whole Regal organization, beginning with Mark Williams."

Exh. PX-66A.  Plaintiff expressed frustration over the following matters:

- He made a $230,000.00 cash down payment in November 2009 for a new 2010 Regal boat that purportedly was to be delivered in March of 2010;

- Delivery of the boat was delayed until mid-April because Williams informed plaintiff that Regal would not ship the boat until the balance of $54,000.00 was paid, which plaintiff then paid against his better judgment;

- After the boat was delivered to LNS, Williams had kept the boat at his dealership for eight weeks under what plaintiff believed to be a ruse that the EVC system needed repairs and Williams was waiting on a Volvo technician. Plaintiff asserted that in fact, Williams was stalling because he had not paid for the boat and could not deliver it without an MSO or title;

- After eight weeks of stalling by Williams, plaintiff called Rudholm and vented his frustration with Williams and Regal, in response to which Rudholm set up a four-way conference call in which Rudholm, plaintiff, Mayo and another Regal representative participated.  Regal assured plaintiff in that call that Regal would do everything possible to resolve all issues and make plaintiff satisfied with the 2010 boat and the Regal organization.  Plaintiff wrote that in fairness to Regal's staff, "they could not help what [Williams] had done, and, I believe the intent of their conference call was sincere";

- After the conference call, Regal arranged a delivery date for LNS to bring the 2010 boat to Conley Bottom, as well as a date for a Volvo representative to do repairs and an LNS employee to do an orientation.  That orientation session had fallen through when the representatives left before plaintiff arrived;

- Plaintiff still did not have an MSO or other paperwork for the boat;

- Regal had sent a factory representative from Florida, Snyder, to do an orientation and he had done a "great job," but plaintiff was frustrated that it was left to plaintiff to get the generator running on a new boat;

- Plaintiff had sent an email to Mayo the prior week notifying him that the generator still did not work and that plaintiff would like to get the boat on the water that coming Thursday, July 22, 2010.  Plaintiff had followed up with two phone calls to Mayo the same date he sent the email asking about the status of the boat, to which plaintiff had not received a response.  Plaintiff stated that it looked as though the boat would sit idle at the dock again over the coming weekend; and

- After calling Rudholm to inquire about the status of the MSO, title and

documentation papers, Rudholm had advised plaintiff to contact GE to check on the status of the MSO.   Plaintiff wrote that the advice on the MSO was "the last straw" and asked why he should have to a call a finance company to obtain his MSO or title when he paid cash for the boat.  Plaintiff wrote that the boat had been in Ohio since mid-April, it was now almost August, and he did not even have the title to the boat he had paid cash for up front.

180.   Plaintiff agreed at trial that the anticipated delivery date of the boat was April, not March 2010.  Further, although plaintiff wrote in his email that the boat had been in Ohio since mid-April, it had actually been delivered to Conley Bottom in Kentucky on June 28, 2010.

181.   Plaintiff asked Kuck in the July 20, 2010 email to stand behind Regal's mission statement and commitment to fairness and customer satisfaction, retake possession of the 2010 boat, and refund his money since the boat had never been titled to him and was apparently being used as collateral by Williams.  Exh. PX-66A.

182.   According to plaintiff, he felt that Kuck and Rudholm had allowed Williams to take advantage of him.  He wanted Regal to rectify the situation and he was affording Regal that opportunity in the July 20, 2010 email.

183.   Kuck responded to plaintiff's July 20, 2010 email that same day, advising plaintiff that he thought matters were resolved, apologizing that they were not, informing plaintiff that he was traveling, and advising plaintiff that he would call him at 6:00 p.m. to discuss his concerns.  Exh. PX 66-A.

184.   Kuck called plaintiff the next day, apologized for any omissions, and assured plaintiff that Regal would do everything possible to his complete satisfaction.  Kuck advised plaintiff that Clement and Mayo would be contacting him.

185.   Clement of Regal was directly involved in handling warranty-type punch list items which plaintiff had spelled out in his June 30, 2010 email to Kuck and directing

resources toward resolving those issues. Clement telephoned Williams and told him
to get the paperwork to plaintiff. Clement also researched how to assist plaintiff in
obtaining the MSO because he had never before dealt with an MSO issue and he was
not getting a satisfactory response from LNS.

186. Mayo sent an email to plaintiff on July 26, 2010, asking if the generator issue had
been resolved. Exh. PX-70.

187. Plaintiff responded by email dated August 1, 2010, that the generator issue was
resolved and it appeared to be working fine. However, he reported that he now had
an issue with the fuel gauge. Plaintiff further reported that he had taken his boat out
and it had "performed beyond [his] expectations!!" Exh. PX-70.

188. The MSO was delivered to plaintiff by LNS's attorney on August 1, 2010.

189. There was no barrier to plaintiff obtaining title to the 2010 boat once he received the
MSO. However, plaintiff chose to not transfer the title after receiving the MSO.
Plaintiff testified that he did not title the boat because he was frustrated over the
situation with the boat, the interior still had not been fixed, and the boating season
was almost over.

190. It is not clear from the evidence presented whether it is legal to operate a boat for a
period of time without an MSO but with proof of ownership.

191. Plaintiff took the boat out on the water in middle to late August to ensure the boat
was operating properly. Plaintiff advised Clement sometime between August 23
and 30, 2010, that the air conditioner was not working again.

192. Plaintiff sent an email dated August 30, 2010, to Mayo which he copied Clement,
Rudholm and Kuck on. Exh. PX-71. Plaintiff stated that he had gotten the sense

40

from Clement that Regal was going to renege on its commitment to make him whole in the situation with Williams.  Plaintiff listed the outstanding issues as follows:

- Plaintiff still did not have a title or documentation for the boat;

- The interior had not been changed out;

- The air conditioner did not work; and

- The fuel gauge had failed.

193.   Plaintiff indicated in the email that he expected Regal to send someone to service the air conditioner and stated that he wanted to be present when the service provider was there so he could ask questions and learn more about the boat since he had no dealer with whom he could talk or ask questions.  Plaintiff said he should not have to be asking about the interior change out again three months after he was promised that all issues, including the interior change out, would be handled to his satisfaction and he would be "made whole."  Exh. PX-71.

194.   Plaintiff also advised Mayo in the August 30, 2010 email that he was planning to take his family out on the boat on Labor Day and if he was unable to do so, he would be finished dealing with Regal.  Exh. PX-71.

195.   Although plaintiff stated in the August 30, 2010 email that he still did not have title or documentation for the boat, plaintiff had obtained the MSO nearly a month earlier on August 1.

196.   Plaintiff sent a clarification to his email the following day stating that although he wanted verification that the taxes had been paid on the boat, he intended to have the boat documented rather than titled so that he did not "have to plaster a bunch of ugly numbers on the side of it."  Exh. PX-71.

41

197. Plaintiff's inability to title the boat was not attributable to Regal. Instead, prior to August 1, 2010, it was attributable to Williams' failure to provide the MSO to plaintiff. After August 1, plaintiff had possession of the MSO and could have titled the boat if he had elected to do so.

198. Plaintiff's failure to resolve the interior color issue to his satisfaction was not attributable to Regal and was not an issue that was covered by its warranty. The mistake was the fault of Williams, who did not place the order for the correct color with Regal. Although the problem was not its responsibility, Regal offered a reasonable solution, which plaintiff rejected. Regal offered to replace the upholstery at its cost, but plaintiff rejected Regal's proposed solution. Plaintiff's expectation was that Regal should manufacture new interior finishes at its cost and ship them to Williams to be swapped out in the 2010 boat. The evidence shows this solution was not reasonable because it was cost prohibitive and Regal offered a more practical alternative.

199. Plaintiff took the boat out on the water shortly before Labor Day. The instrument panel lights did not work and the fresh water pump was not working properly. In addition, the air conditioner kept going out on the HPF (high pressure freon) setting.

200. Plaintiff did not take his boat out on Labor Day because the air conditioner was not working. Plaintiff had not contacted Hilltop Marine prior to Labor Day to make the needed repairs or adjustments to the air conditioner.

201. After Labor Day, by email dated September 7, 2010, plaintiff advised Mayo at Regal that the air conditioner was still not working properly but "kept going out on HPF"; the fuel gage was not working, which he had reported to Mayo on August 1;

42

the instrument lights were not working; the trim tab indicators were installed

backwards; and the fresh water pump worked only when the boat was hooked up to

the dock.  Exh. PX-72.

202.   According to plaintiff, the fuel gage issue would not preclude him from using the

boat.

203.   The fuel gage was a part that was covered by Regal's Limited Warranty and

plaintiff could have contacted Hilltop Marine to have the problem fixed.

204.   The September 7 email was the first notice Regal received that the instrument panel

lights did not work, the freshwater pump needed repair, and the trim tab indicator

lights had been installed backwards by LNS.

205.   The trim tab indicator lights had been added by LNS and were not covered by

Regal's warranty.  The lights did not affect the operation or safety of the boat.

206.   Mayo responded to plaintiff's September 7 email via email the next day.  Mayo

advised plaintiff that Mayo had spoken to Clement, who was out of the country, and

Clement had advised Mayo that he and plaintiff had discussed the fact that Regal

had set up Hilltop Marine to service plaintiff's boat and assist him with his warranty

needs and that plaintiff should contact Hilltop Marine directly when he had a need.

Mayo advised plaintiff that he would be happy to work with Hilltop Marine if the

dealer needed parts or technical information.  Mayo included Hilltop Marine's

contact information in the email.  Exh. PX-73.

207.   Plaintiff had Hilltop Marine service the air conditioner on September 8, 2010.

According to the service invoice, Hilltop Marine checked the air conditioner, found

it had "lost prime," and re-primed the unit, meaning it forced water through the unit

43

to the pump.  Exh PX-74.  The bill was sent to plaintiff, who advised Hilltop Marine to send it to Regal.

208.  Plaintiff could have contacted Hilltop Marine prior to Labor Day or at any time for needed repairs, but plaintiff elected not to do so.  Plaintiff refused to schedule repairs with Hilltop Marine and insisted that Regal schedule any necessary repairs on the boat with Hilltop Marine.  Plaintiff acknowledged that while it may have been his responsibility to call and arrange for repairs on warranty items, he did not think he should have had to call "anybody for anything" when the boat had only a few hours of use on it.

209.  Plaintiff did not identify any issues with the operation of the boat that he reported to Regal that either were not addressed by Regal or could not be addressed by Regal through its authorized dealer, Hilltop Marine.  Plaintiff acknowledged that at no time did Regal respond that it would not or could not fix any defect that plaintiff reported to the company.

210.  After September 7, 2010, plaintiff did not send any further communications to Regal until he emailed Kuck on April 3, 2012, following the commencement of this litigation.

## K.  Plaintiff's filing of the lawsuit

211.  Plaintiff filed this lawsuit with the intention of recovering the following damages: (1) the cost of the boat ($284,560.00); the costs of the unused dock lease for the summer of 2010 ($4,400.00); insurance on the boat from May 20, 2010 through May 2013 ($6,746.76), with additional amounts accruing monthly; the cost of the custom trailer plaintiff had built for the boat ($10,757.00); and attorney fees.

44

212. Plaintiff filed this lawsuit based on: 1) Regal's alleged failure to stand behind its mission statement and promise of customer satisfaction, particularly after Kuck and Rudholm promised to see that plaintiff was completely satisfied; 2) Regal's apparent indifference to the fact that plaintiff had missed the entire boating season due to Regal's alleged failure to deliver the MSO and properly equip/repair the boat; 3) Regal's act of convincing plaintiff to deal with a disreputable dealer despite allegedly having full knowledge that LNS was under a Forbearance Agreement and had a history of SOT; 4) Regal's alleged continuous failures related to warranty issues, including the failure to replace the interior, which was not the color plaintiff had selected; and 5) Regal's allegedly deceptive business practices related to the MSO.

213. Plaintiff's position is that had Rudholm not channeled him to LNS in April 2009, he never would have bought the 2008 boat, and without Rudholm's encouragement to buy the 2010 boat so that Regal could secure another boat order, plaintiff would not have purchased the 2010 boat. Plaintiff claims that Regal can be held liable for damages he incurred in connection with his purchase of the 2010 boat based on its failure to disclose information about LNS prior to the 2008 boat transaction and subsequent acts and omissions which plaintiff alleges are related to the 2008 and 2010 boat transactions and settlement negotiations.

214. Plaintiff alleges that due to Regal's alleged acts and omissions, he reached a point where, in his words, "he was just not interested in dealing with Regal any further and asked them to either make it right and honor their mission statement or take the boat back and sell it to someone else."

45

## II. Conclusions of Law

### A. Governing law

1. Ohio law governs the parties' dispute as both parties have consistently relied on Ohio law, thereby indicating consent to the forum state's law. *See Kuns v. Ford Motor Co*., 926 F. Supp.2d 976, 982 (N.D. Ohio 2013), *aff'd*, 543 F. App'x 572 (6th Cir. 2013) (citing *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.,* 611 F.3d 339, 345 (7th Cir. 2010); *Leininger v. Reliastar Life Ins. Co.,* No. 2:06-cv-12249, 2007 WL 2875283, at *7 (E.D. Mich. Sept. 28, 2007); *Carbonic Products Co. v. Welding & Cutting Supply Co.,* 823 F.2d 553, at *2 (6th Cir. 1987) (table)).

### B. Breach of express warranty

#### i. Express warranty under a contract

2. To establish a claim for breach of express warranty under Ohio law, plaintiff must prove: (1) the item in question was subject to a warranty; (2) the item did not conform to the warranty; (3) the seller was given a reasonable opportunity to cure any defects; and (4) the seller failed to cure the defects within a reasonable period of time or after a reasonable number of attempts. *Kuns*, 543 F. App'x at 575-76 (citing *Temple v. Fleetwood Enters, Inc*., 133 F. App'x 254, 268 (6th Cir. 2005) (citing *Abele v. Bayliner Marine Corp*., 11 F. Supp.2d 955, 961 (N.D. Ohio 1997)).

3. Ohio law provides that express warranties by sellers of goods are created in one of the following three ways:

> (1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of

the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Ohio Rev. Code § 1302.26(A).

4.  A number of Ohio courts have recognized that privity is not required to impose liability for breach of an express warranty. *Hahn v. Jennings*, No. 04AP-24, 2004 WL 2008474, at *6 (Ohio App. 10 Dist. Sept. 9, 2004) ("There are cases indicating an absence of privity does not defeat a UCC [Uniform Commercial Code] action in contract to enforce an express warranty") (citing *C.W. Zumbiel Co. v. Reinchhold Chemicals, Inc.*, No. C-950644, 1996 WL 400501 (Ohio App. 1 Dist. June 5, 1996); *Lawyers Cooperative Publishing Co. v. Muething*, 603 N.E.2d 969 (Ohio 1992); *Johnson v. Monsanto Co.,* No. 11-02-02, 2002 WL 2030889 (Ohio App. 3 Dist. Sept. 6, 2002)). *See also Voytovich v. Bangor Punta Operations, Inc*., 494 F.2d 1208, 1211 (6th Cir. 1974) ("Under Ohio law it is clear that a purchaser who relies on the express warranty of a manufacturer in purchasing goods, and suffers injury or loss of bargain, may directly sue the manufacturer.") (citing *Rogers v. Toni Home Permanent Co*., 147 N.E.2d 612 (Ohio 1958); *Inglis v. American Motors Corp*., 209 N.E.2d 583 (Ohio 1965)).

5.  Regal was bound by the terms of the Limited Warranty under Ohio Rev. Code § 1302.26(A).

6. Regal did not breach the Limited Warranty, which was an express warranty under Ohio Rev. Code § 1302.26(A).  Regal did not warrant that the boat would be problem free and that repairs would be unnecessary.  Rather, Regal expressly warranted to "repair or replace any parts found to be defective in materials or workmanship for a period of one (1) year from the date of delivery," subject to certain exceptions and limitations.  Exh. DX-93.  Plaintiff did not prove by a preponderance of the evidence that Regal failed to repair or replace in a timely manner any part of the 2010 boat that was expressly covered by the terms of the Limited Warranty, specifically: (1) the fuel gage, (2) the instrument panel lights, (3) the fresh water pump, or (4) the air conditioner/generator.

7. Each time plaintiff gave Regal notice of a defect covered by the Limited Warranty, Regal honored its warranty by making a dealership - Hilltop Marine - available to perform the repairs in a reasonable and timely manner and covering the cost of the repairs.

8. The air conditioner/generator was covered by the Limited Warranty.  There is no evidence that the air conditioner/generator system was defective.  However, the air/conditioner generator did malfunction twice during July and August 2010.  The evidence shows that Regal's representative, Dan Snyder, created a vapor lock while conducting the orientation with plaintiff on July 10, 2010.  Because the air conditioner/generator was covered by the warranty, Regal was responsible for resolving the issue.  Plaintiff was instructed on how to resolve the problem himself, but instead he elected to have Hilltop Marine resolve the malfunction in accordance with the terms of the Limited Warranty.  Hilltop Marine performed repairs on both

the air conditioner and generator at Regal's expense by July 20, 2010.  Thus, Regal complied with the terms of the Limited Warranty by performing the repairs of the air conditioner/generator through its authorized dealer in a reasonable and timely manner.

9. Regal complied with the terms of the Limited Warranty by paying for repairs to the air conditioner after plaintiff gave Regal notice that the air conditioner was not functioning between August 23 and August 30, 2010.  Plaintiff had been advised by this point and was aware that he could resolve problems with parts covered by the Limited Warranty by contacting Hilltop Marine, who would perform repairs at Regal's expense.  In fact, plaintiff apparently contacted Hilltop Marine to fix the air conditioner; Hilltop Marine re-primed the air conditioning unit on September 8, 2010; and Regal bore the costs.  There is no evidence that the delay between notice to Regal and the September 8, 2010 repair was attributable to Regal.

10. Regal did not breach the Limited Warranty by failing to make repairs to the air conditioner/generator.

11. Regal did not breach the Limited Warranty by failing to make repairs to the fuel gage, which was covered under the Limited Warranty.  Plaintiff first gave Regal notice of an issue with the fuel gage on August 1, 2010.  Plaintiff conceded he could have continued to operate the boat despite the defect, and he did in fact take the boat out on the water prior to Labor Day after notifying Regal of the defective fuel gage.  Nonetheless, Regal was obligated to cure the defect within a reasonable time of receiving notice of the defect.  Regal fulfilled its obligation by authorizing Hilltop Marine to repair defects covered by the Limited Warranty at Regal's cost

49

and notifying plaintiff of the repair service available to him. By refusing to contact Hilltop Marine to repair the fuel gage, plaintiff did not allow Regal a reasonable opportunity to cure the defect.

12. Regal did not breach the Limited Warranty by failing to make repairs to the instrument panel lights and the fresh water pump, both of which were covered by the Limited Warranty. Plaintiff first gave Regal notice of these defects by email dated September 7, 2010. Regal responded to plaintiff through Clement the following day and reminded him that Hilltop Marine was available to perform all repairs covered under the Limited Warranty and that plaintiff was to contact Hilltop Marine directly for repairs. Plaintiff unreasonably and inexplicably refused to contact Hilltop Marine in order to have these items repaired at Regal's expense. Plaintiff testified that he expected Regal to coordinate the repairs for him, but Regal was not obligated under the terms of the Limited Warranty to arrange repairs on plaintiff's behalf. Regal fulfilled its obligations under the Limited Warranty by authorizing Hilltop Marine to perform repairs under the Limited Warranty at Regal's expense.

13. Regal did not breach the Limited Warranty by failing to repair the EVC system in a timely manner. The EVC system was not covered by Regal's Limited Warranty. Instead, the EVC system was a Volvo part which was covered by a Volvo warranty. In any event, within one week of being notified of a problem with the EVC system on June 30, 2010, Regal arranged for a Volvo representative to repair the system. A Volvo representative went to Conley Bottom for this purpose on July 7, 2010. This was a reasonable period of time within which to respond. There was no reported

50

problem with the EVC system after that date. Regal went beyond its obligations to plaintiff under the Limited Warranty by addressing and resolving the EVC issue.

14. Regal did not breach the Limited Warranty by failing to resolve the interior seating color mistake. The interior color issue was not a "defect" that was covered by the Limited Warranty. The material itself was not defective, and Regal was not obligated under the terms of the Limited Warranty to replace the upholstery or the seats themselves. Instead, the evidence shows that LNS did not correctly convey plaintiff's color choice for the interior seating to Regal when placing the order for the 2010 boat. Further, plaintiff delayed a solution to the problem by changing his mind regarding how he wanted the problem resolved and who should be responsible for its resolution. Plaintiff at one point told LNS not to concern itself with the interior seating because he would take care of the problem on his own (PX-45 at PLF 54), and twice he clearly disavowed to LNS that the issue was Regal's problem. (PX-47 at PLF 199, 200). Nonetheless, Regal went beyond its obligations under the Limited Warranty by proposing a reasonable solution of shipping the factory "skins" in the correct color to be installed on the boat by a local upholsterer, all at Regal's cost. Plaintiff chose to reject Regal's proposal. Regal was not at fault for installation of the incorrect color upholstery and, even assuming Regal did bear responsibility, plaintiff denied Regal a reasonable opportunity to cure any defect in the upholstery.

15. Regal did not breach the Limited Warranty by failing to procure the MSO for plaintiff. The MSO was not covered by the Limited Warranty, and it was the dealer who should have provided the MSO to plaintiff. Nonetheless, Regal went beyond

its obligations under the Limited Warranty by attempting to locate the MSO on

plaintiff's behalf and advising plaintiff as to how he could obtain the MSO.

Plaintiff cannot be heard to complain about his difficulties in obtaining paperwork

for the boat after August 1, 2010, because plaintiff was in possession of the MSO as

of that date but he elected not to title or document the boat.

### ii. Express warranty under a tort theory of liability

16. Ohio courts have held that a seller's advertisement of its product may constitute an

express warranty so long as the statement in the advertisement satisfies Ohio Rev.

Code § 1302.26(A) (*i.e.*, the statement either constitutes an affirmation of fact or

promise made by the seller to the buyer which relates to the goods and becomes part

of the basis of the bargain, or the statement constitutes a description of the goods

which is made part of the basis of the bargain). *Nat'l Mulch & Seed, Inc. v. Rexius*

*Forest By-Products Inc*., No. 2:02-cv-1288, 2007 WL 894833, at *15 (S.D. Ohio

Mar. 22, 2007) (citing *Jones v. Kellner,* 5 Ohio App.3d 242, 242-43 (Ohio App. 8

Dist. 1982)). *See also Schwartz v. Gross*, 114 N.E.2d 103, syll. ¶ 1 (Ohio App. 9

Dist. 1952) ("A positive statement of the quality of goods is an express warranty if

the natural tendency of the statement is to induce a buyer to purchase the goods, and

if the buyer purchases the goods in reliance thereon.").

17. "[A]n affirmation of the value of the goods" or a statement that purports to be

"merely the seller's opinion or commendation of the goods" cannot create an

express warranty. *Nat'l Mulch & Seed, Inc.*, No. 2:02-cv-1288, 2007 WL 894833,

at *15 (citing Ohio Rev. Code § 1302.26(B)). *See also Schwartz*, 114 N.E.2d 103,

syll. ¶ 2 ("It is a seller's privilege to 'puff' his goods so long as his salesmanship

remains within the range of 'dealer's talk' and mere expression of opinion."); *Marable v. Michael J. Auto Sales*, 2013 Ohio 1750, 2013 WL 1820811, at *3 (Ohio App. 1 Dist. May 1, 2013) (advertisement did not cross the line from "puffing" to warranty but instead was no more than "a presale inducement to purchase the automobile, which is the very purpose of advertising"); *Chic Promotion, Inc. v. Middleton Sec. Sys., Inc.*, 688 N.E.2d 278, 282 (Ohio App. 12 Dist. 1996) (sales brochure did not cross the line from "puffing" to warranty but was presale inducement to people to purchase the product).

18. "The term 'Puffing' refers generally to an expression of opinion not made as a representation of fact." *Davis v. Byers Volvo*, No. 11CA817, 2012 WL 691757, at *9 (Ohio App. 4 Dist. Feb. 24, 2012). "Puffing" is generally defined as "exaggerated blustering or subjective boasting upon which no reasonable consumer would rely." *Id.*, at *8 (collecting cases). "A seller has some latitude in puffing his goods, but he is not authorized to misrepresent them or to assign to them benefits they do not possess. Statements made for the purpose of deceiving prospective purchasers cannot properly be characterized as mere puffing." *Id.*, at *9.

19. The following statements which Rudholm, Regal's Sales Manager, made to plaintiff on several occasions about the quality of Regal boats and Regal's customer service do not satisfy the requirements of Ohio Rev. Code § 1302.26(A) and did not create an express warranty: (1) Regal built the highest quality boats; (2) Regal lived up to its mission statement, 3) Regal boats were the best boats on the market, 4) plaintiff would be well served to buy a Regal boat, 5) the Regal organization stands behind every boat it sells, and 6) the customer is Regal's first priority. These statements

53

constitute nothing more than "the seller's opinion or commendation of the goods" and as such cannot create an express warranty. Rudholm's opinions as to the quality of Regal's boats and its customer service constitute "puffery" and a pre-sale inducement which did not cross the line to an express warranty.

20. Excerpts from Regal's brochures and website, which plaintiff asserts contains representations similar to those Rudholm made to him personally about quality, customer satisfaction, and the Regal mission statement, likewise reflect the seller's opinion and are an affirmation of the value of the goods which cannot create an express warranty.

21. Assuming, *arguendo*, that statements to the effect that Regal's boats had won "multiple J.D. Power awards for quality" could create an express warranty, there was no evidence presented at trial to show such statements were factually inaccurate. Thus, no claim for breach of an express warranty lies based on these representations.

## C. Breach of implied warranty

### i. Breach of implied warranty under Ohio Rev. Code § 1302.27

22. Ohio law recognizes implied warranty claims under both contract law and tort law. *In re Porsche Cars North America, Inc.*, 880 F. Supp.2d 801, 819 (S.D. Ohio 2012).

23. A contract claim for breach of implied warranty is governed by Ohio Rev. Code § 1302.27, which provides that "[u]nless excluded or modified as provided in section 1302.29 of the Revised Code, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Ohio Revised Code § 1302.27(A).

24.    The statute provides that in order to be merchantable, goods must satisfy the

following criteria:

> (1) pass without objection in the trade under the contract
> description; and
> (2) in the case of fungible goods are of fair average quality within
> the description; and
> (3) are fit for the ordinary purposes for which such goods are used;
> and
> (4) run, within the variations permitted by the agreement, of even
> kind, quality and quantity, within each unit and among all units
> involved; and
> (5) are adequately contained, packaged, and labeled as the
> agreement may require; and
> (6) conform to the promises or affirmations of fact made on the
> container or label if any.

Ohio Rev. Code § 1302.27(B).

25.    Ohio Rev. Code § 1302.29(B) governs disclaimers of warranty.  It provides:

> Subject to division (C) of this section, to exclude or modify the
> implied warranty of merchantability or any part of it the language
> must mention merchantability and in case of a writing must be
> conspicuous, and to exclude or modify any implied warranty of
> fitness the exclusion must be by a writing and conspicuous[.]

26.    The waiver provision in the Regal warranty, which reads in pertinent part as

follows, is poorly constructed and does not conspicuously disclaim the implied

warranty of merchantability for the 2010 boat:

> THIS IS A LIMITED WARRANTY; REGAL MAKES NO
> WARRANTY, OTHER THAN CONTAINED HEREIN; TO THE
> EXTENT ALLOWED BY LAW ANY WARRANTIES OF
> MERCHANTABILITY OR FITNESS FOR A PARTICULAR
> PURPOSE ARISING IN STATE LAW ARE EXPRESSLY
> EXCLUDED TO THE EXTENT ALLOWED BY LAW, ANY
> IMPLIED WARRANTY OF MERCHANTABILITY IS LIMITED
> TO THE DURATION OF THIS LIMITED WARRANTY.  ALL
> OBLIGATIONS OF REGAL ARE SPECIFICALLY SET FORTH
> HEREIN.  REGAL DOES NOT AUTHORIZE ANY PERSON
> OR DEALER TO ASSUME ANY LIABILITY IN
> CONNECTION WITH REGAL BOATS.

55

Exh. DX-93.

27. Nor did plaintiff release any breach of warranty claims he may have against Regal by entering into the Settlement Agreement. The Settlement Agreement was between plaintiff and LNS and Regal was not a signatory to the Agreement.

28. Nonetheless, plaintiff did not prove his claim against Regal for breach of the implied warranty of merchantability.

29. Ohio law requires privity in order to sustain a contract-based breach of implied warranty claim. *Curl v. Volkswagen of Am., Inc.,* 871 N.E.2d 1141, 1147 (Ohio 2007). *See Savett v. Whirlpool Corp.*, No. 12-cv-310, 2012 WL 3780451, at *10 (N.D. Ohio Aug. 31, 2012). *See also Kuns*, 926 F. Supp.2d at 986 (in Ohio, the UCC's implied warranty of merchantability is not enforceable against manufacturers who are not in privity with the purchaser) (citing *Curl*, 871 N.E.2d at 1147).

30. In this case, plaintiff was not a party to a contract with Regal, the manufacturer of the 2010 boat, but instead he purchased the boat from LNS, an authorized Regal dealer. The fact that LNS was an authorized Regal dealer is insufficient to establish privity between plaintiff and Regal because "vertical privity exists only between immediate links in the distribution chain." *Buckeye Res., Inc. v. DuraTech Indus. Int'l, Inc.*, 3:11-cv-335, 2011 WL 5190787, at *4 (S.D. Ohio Oct. 31, 2011) (quoting *Curl*, 871 N.E.2d at 1148). As a general rule, "[o]ne who receives goods from another for resale to a third person is not thereby the other's agent in the transaction." *Id*. (citing *Curl,* 871 N.E.2d at 1148) (quoting Restatement of the Law 2d, Agency (1958), § 14J)).

56

31. Two exceptions exist whereby a manufacturer and an individual who purchases a product from a distributor may be deemed to be in privity of contract for purposes of an implied warranty claim. The first is "when the manufacturer is so involved in the sales transaction that the distributor merely becomes the agent of the manufacturer[.]" *Bobb Forest Prods., Inc. v. Morbark Indus. Inc.*, 783 N.E.2d 560, 576 (Ohio App. 7 Dist. 2002) (quoting *Mettler-Toledo, Inc. v. Wysong & Miles Co.*, No. 98AP-1462, 1999 WL 1009721, at *3 (Ohio App. 10 Dist. Nov. 9, 1999); *Myers v. Moore Distrib., Inc.*, No. CA92-07-125, 1993 WL 19093, at *2 (Ohio App. 12 Dist. Feb. 1, 1993)). The second is when the consumer is "an intended third-party beneficiary to a contract." *Id.* (quoting *Am. Rock Mechanics, Inc. v. Thermex Energy Corp.*, 608 N.E.2d 830 (Ohio App. 8 Dist. 1992)). *See also Buckeye Res., Inc.*, 3:11-cv-335, 2011 WL 5190787, at *4.

32. Plaintiff did not prove by a preponderance of the evidence that either exception applies to the 2010 boat purchase. First, although Regal acted as a mediator between plaintiff and Williams in resolving the dispute over ownership of the 2008 boat and formulating a Settlement Agreement which included plaintiff's purchase of the 2010 boat from Regal, Regal was not involved to the extent that Williams/LNS became merely Regal's agent.

33. Second, plaintiff was not the intended beneficiary of a third-party contract between Regal and LNS. To the contrary, the contracting parties were Williams/LNS and plaintiff. Plaintiff, with the advice and representation of counsel, and Williams negotiated the terms of the Settlement Agreement which encompassed plaintiff's purchase from LNS of a specific boat manufactured by Regal. Regal was not a

57

signatory to the Settlement Agreement and was not bound by the terms of the contractual agreement.  Plaintiff dealt solely with Williams and LNS, not Regal, during the manufacturing and delivery process.  Thus, while plaintiff and Williams/LNS were in privity of contract, plaintiff and Regal were not.

34. Assuming, *arguendo*, that plaintiff and Regal were in privity of contract, plaintiff failed to prove by a preponderance of the evidence that the 2010 boat did not satisfy the definition of "merchantable" under Ohio Rev. Code § 1302.27.  Although the boat had certain defects and experienced malfunctions that required repairs as outlined above, the issues were relatively minor and the evidence showed they could have been resolved at Regal's expense had plaintiff contacted the authorized Regal dealer, Hilltop Marine, to complete the repairs.

## ii. Breach of implied warranty under a tort theory of recovery

35. "'Implied warranty in tort' is a common law cause of action that imposes liability upon a manufacturer or a seller for breach of an implied representation that a product is 'of good and merchantable quality, fit and safe for its ordinary intended use.'"  *Sirlouis v. Four Winds Intern. Corp.*, No. 1:10cv00469, 2012 WL 1068709, at *15 (N.D. Ohio March 29, 2012) (citing *White v. DePuy, Inc.,* 718 N.E.2d 450 (Ohio App. 12 Dist. 1998) (citing Ohio Jurisprudence (1987) 470, Products Liability, § 39)).

36. A remote purchaser can pursue a breach of implied warranty claim in tort when contractual privity is absent.  *In re Porsche Cars North Am., Inc.*, 880 F. Supp.2d at 865-66.

37. The law in Ohio "is not well-developed on whether a breach of an implied warranty

in tort claim can exist in the presence of a valid, enforceable written warranty." *See Hartman v. Mercedes, L.L.C.*, No. 1:08-cv-03034, 2010 WL 907969, at *7 (N.D. Ohio Mar. 11, 2010) (discussing Ohio law).

38. Nor is this Court persuaded that Ohio courts would recognize an implied warranty in tort claim when there is a valid, enforceable written warranty that governs the parties' relationship. However, it is not necessary to resolve this issue for purposes of the present case. Assuming, *arguendo*, that plaintiff can bring this tort claim despite the existence of the enforceable written warranty that covers the 2010 boat, plaintiff failed to prove the elements of a breach of the implied warranty of merchantability under a tort theory.

39. To prevail on an implied warranty in tort claim under Ohio law, a plaintiff must prove: (1) a defect existed in a defendant's product which made it unfit for its ordinary, intended use; (2) the defect existed at the time the product left the defendant's possession; and (3) the defect was the proximate cause of the plaintiff's injuries. *In re Porsche Cars North America, Inc.*, 880 F. Supp.2d at 867.

40. Plaintiff failed to prove by a preponderance of the evidence that any defect in the 2010 boat made the boat unfit or unsafe for its ordinary and intended purpose. To the contrary, there is no evidence that the defects in the boat could not have been repaired within a reasonable amount of time and at no expense to plaintiff by Hilltop Marine, the authorized Regal dealer located 15 minutes from plaintiff's boat dock, had plaintiff simply contacted this dealer to make arrangements for repairs. Regal had notice of a problem with the air conditioner on July 10, 2010, and it was fixed by July 20, 2010, ten days later. Plaintiff enjoyed the boat, the air conditioner

malfunctioned again, plaintiff gave Regal notice of the problem, and it was repaired

on September 8, 2010, after plaintiff apparently contacted Hilltop Marine to have

the air conditioner re-primed. Plaintiff also gave Hilltop notice of a malfunction in

the generator after the orientation with Snyder on July 10, 2010, and repairs were

performed by July 20, 2010. Plaintiff first gave Regal notice of problems with the

instrument panel lights and fresh water pump on September 7, 2010, and Mayo

responded appropriately by reminding plaintiff that he should contact Hilltop

Marine directly for his service needs and Regal would work with Hilltop Marine to

provide any technical information or parts as needed, and Mayo provided Hilltop

Marine's contact information to plaintiff. However, there is no evidence that

plaintiff gave Regal an opportunity to fix these problems by asking Hilltop Marine

to perform the repairs. The evidence shows that when Hilltop Marine was contacted

to perform repairs, the repairs were readily performed at Regal's expense so that

plaintiff could take the boat out on the water. This evidence negates any claim that

the boat was unfit or unsafe for its ordinary and intended purpose.

**D. The Ohio Consumer Sales Practice Act**

41. The Consumer Sales Practice Act (CSPA), Ohio Rev. Code § 1345.01, *et seq.*,

prohibits a supplier from committing "an unfair or deceptive act or practice in

connection with a consumer transaction" whether before, during, or after the

transaction. Ohio Rev. Code § 1345.02(A).

42. In order to prevail on a claim under the CSPA, plaintiff must establish that "a

material misrepresentation, deceptive act or omission" impacted his decision to

purchase the item at issue. *Sirlouis v. Four Winds Intern. Corp.,* No. 1:10-cv-

00469, 2012 WL 1068709, at *16 (N.D. Ohio March 29, 2012) (citing *Mathias v.*

*Am. Online, Inc.*, No. 79427, 2002 WL 377159, at *5 (Ohio App. 8 Dist. Feb. 28,

2002) (citing *Janos v. Murduck*, 672 N.E.2d 1021 (Ohio App. 9 Dist. 1996)).

43. Because the CSPA "is a remedial law which is designed to compensate for

traditional consumer remedies," the Act must be liberally construed. *Einhorn v.*

*Ford Motor Co.*, 548 N.E.2d 933, 935 (Ohio 1990) (citations omitted).

44. Ohio Rev. Code § 1345.01 defines terms used in the CSPA. "Consumer

transaction" is defined as "a sale, lease, assignment, award by chance, or other

transfer of an item of goods, a service, a franchise, or an intangible, to an individual

for purposes that are primarily personal, family, or household, or solicitation to

supply any of these things."

45. "Supplier" means "a seller, lessor, assignor, franchisor, or other person engaged in

the business of effecting or soliciting consumer transactions, whether or not the

person deals directly with the consumer." Ohio Rev. Code § 1345.01.

46. A "consumer" is defined as "a person who engages in a consumer transaction with a

supplier." Ohio Rev. Code § 1345. 01.

47. Ohio Rev. Code § 1345.02 sets forth a non-exhaustive list of unfair or deceptive

acts or practices, including representations by a supplier:

> (1) That the subject of a consumer transaction has sponsorship,
> approval, performance characteristics, accessories, uses, or benefits
> that it does not have;
> (2) That the subject of a consumer transaction is of a particular
> standard, quality, grade, style, prescription, or model, if it is not;
> (3) That the subject of a consumer transaction is new, or unused, if
> it is not;
> (4) That the subject of a consumer transaction is available to the
> consumer for a reason that does not exist;
> (5) That the subject of a consumer transaction has been supplied in

61

accordance with a previous representation, if it has not, except that the act of a supplier in furnishing similar merchandise of equal or greater value as a good faith substitute does not violate this section;
(6) That the subject of a consumer transaction will be supplied in greater quantity than the supplier intends;
(7) That replacement or repair is needed, if it is not;
(8) That a specific price advantage exists, if it does not;
(9) That the supplier has a sponsorship, approval, or affiliation that the  supplier does not have;
(10) That a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

48.   Ohio courts have specifically held that a manufacturer's failure to repair a defect

covered by a warranty can constitute a violation of the CSPA.  *Temple,* 133 F.

App'x  at 266 (citing *Boyle v. Daimler Chrysler Corp.,* No. 2001-CA-81, 2002 WL

1881157, at *7 (Ohio App. 2 Dist. Aug. 16, 2002); *Brown v. Lyons,* 332 N.E.2d

380, 385 (Ohio Ct. C.P. 1974)).

49.   The CSPA generally defines "unfair or deceptive consumer sales practices" as

practices that "mislead consumers about the nature of the product [or service] they

are receiving. . . ." *Davis*, No. 11CA817, 2012 WL 691757, at *7 (citing *Johnson v.

Microsoft Corp.,* 834 N.E.2d 791, ¶ 24 (Ohio 2005)).

50.   A deceptive act is one that "has the tendency or capacity to mislead consumers

concerning a fact or circumstance material to a decision to purchase the product or

service offered for sale." *Id*., at *8  (citations omitted).

51.   A deceptive act "has the likelihood of inducing a state of mind in the consumer that

is not in accord with the facts." *Id.*, at *7 (citations omitted).  Generally, "[t]he

basic test is one of fairness; the act need not rise to the level of fraud, negligence, or

breach of contract." *Id.* (citations omitted).

52.   Thus, to be actionable as a deceptive act, the supplier's act must be (1) false, and (2) material to a consumer's decision to purchase the product or service involved.  *Id.*, at *8.  "A matter that is merely incidental to the choices a consumer must make when deciding to engage in the transaction is, therefore, not 'deceptive' within the meaning of the [CSPA] . . . ."  *Id.* (citation omitted).

53.   "[S]tatements of mere puffing or opinion [are] not actionable under the [CSPA]." *Id.* (citing *Howard v. Norman's Auto Sales,* No. 02AP-1001, 2003 WL 21267261, ¶ 34 (Ohio App. 10 Dist. June 3, 2003)).

54.   In a case brought under Ohio law, a federal district court found that general statements regarding a boat's quality made by the defendants and their agent "clearly [could not] form the basis of a claim under the OCSPA."  The Court stated:

> The habit of vendors to exaggerate the advantages of the bargain that they are offering to make is a well recognized fact.  An intending purchaser may not be justified in relying upon his vendor's statement of the value, quality or other advantages of a thing that he is intending to sell as carrying with it any assurance that the thing is such as to justify a reasonable man in praising it so highly. . . .  This is true particularly of loose general statements made by sellers in commending their wares, which are commonly known as "puffing," or "sales talk."  It is common knowledge and may always be assumed that any seller will express a favorable opinion concerning what he has to sell; and when he praises it in general terms, without specific content or reference to facts, buyers are expected to and do understand that they are not entitled to rely literally upon the words.  Such statements like the claims of campaign managers before election, are rather designed to allay the suspicion which would attend their absence than to be understood as having any relation to objective truth.  Thus no action lies against a dealer who describes the automobile he is selling as a "dandy," a "bearcat," a "good little car," and a "sweet job," or as "the pride of our line," or "the best in the American market."

*Abele*, 11 F. Supp.2d at 963-64 (citing *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 682 (5th Cir. 1986); *Jordan v. Paccar, Inc.*, 37 F.3d

1181 (6th Cir. 1994) ("seller's representation that truck was 'rock-solid' was mere commercial puffery")).

55. Similarly, a celebrity football player's statements in an advertisement comparing a vehicle dealership to a top football conference and a "tradition of excellence" were held to constitute mere "puffery" and thus were not actionable under the CSPA. *Davis*, No. 11CA817, 2012 WL 691757, at *11. Conversely, representations that a boat "would go faster than 40 mph" and that the boat "was unsurpassed for trouble-free operation" were held to go beyond mere "puffing" by the Court in *Abele*, 11 F. Supp.2d at 964.

56. The Court in *Abele* noted other examples of representations that went beyond mere puffing and were actionable under the CSPA, including a seller's assertion that its motor oil offered better protection against engine wear (*id.*, citing *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993)) and a claim that Tylenol "gives unsurpassed relief" (*id.*, citing *American Home Prods. Corp. v. Johnson & Johnson*, 654 F.Supp. 568 (S.D.N.Y. 1987)).

57. As a remedy for a violation of § 1345.02, the consumer has the alternative under § 1345.09(B) of either rescinding the transaction or recovering damages up to three times the amount of those actually incurred for the violation. The consumer is required to elect between the two remedies prior to trial. *Williams v. Banner Buick, Inc.*, 574 N.E.2d 579 (Ohio App. 12 Dist. 1989).

58. Plaintiff attempted to prove at trial that Regal engaged in unfair and deceptive acts prohibited under Ohio Rev. Code § 1345.02(B) by: (1) inducing plaintiff to continue to do business with LNS in 2009 despite knowing that LNS was having

64

financial difficulties, (2) making misrepresentations in connection with the 2010 boat purchase, including persuading plaintiff to purchase the 2010 boat and orchestrating the deal for the purchase despite knowledge of LNS's financial difficulties and Williams' deceptive practices, and (3) numerous other acts and practices as set forth in ¶¶ 68 through 73, *infra*.

59. Plaintiff's acquisition of the 2010 boat is a "transaction" that is covered by the CSPA. Plaintiff purchased the 2010 boat from LNS pursuant to the terms of the Settlement Agreement.

60. Plaintiff did not prove by a preponderance of the evidence that Regal committed an unfair or deceptive act related to plaintiff's acquisition of the 2010 boat.

61. Statements made by Regal representative Rudholm in April 2009 to persuade plaintiff to continue to do business with LNS do not constitute an unfair or deceptive act related to the 2010 boat transaction within the meaning of the CSPA. Those comments were too far removed from the 2010 boat purchase to have misled plaintiff about the 2010 boat and LNS's financial condition at the time he entered into the Settlement Agreement to purchase the 2010 boat. In fact, plaintiff conceded at trial that he was aware of LNS's financial difficulties at the time he entered into the Settlement Agreement for the sale of the 2008 boat and purchase of the 2010 boat, and he was mistrustful of Williams based on his prior dealings with him.

62. Furthermore, although Rudholm was aware that Williams had a forbearance agreement with GE at the time he made the comments in April 2009, LNS was still in the business of selling boats and GE was continuing to finance boats that LNS

sold.  Thus, Rudholm did not deceive plaintiff by telling him that LNS had been a reputable dealer for a number of years and could put a deal together with plaintiff.

63. Rudholm did not commit a deceptive act by convincing plaintiff to continue doing business with LNS after the deal fell through on the model year 2007 boat in April 2009 by "touting the quality of Regal's boats," telling plaintiff that "customer service was paramount," and telling plaintiff about "all of the quality and customer service awards Regal had won."  Plaintiff has not identified any false and misleading misrepresentations Regal made in connection with its customer service awards.  Further, the representations regarding the quality of its boats and the importance of customer service which plaintiff attributes to Regal constitute mere puffery which is not actionable under the CSPA.

64. Plaintiff did not prove that Rudholm committed any unfair or deceptive act by "routinely" convincing plaintiff to continue doing business with LNS despite knowing that LNS was in serious financial distress; that Williams had attempted to raise the cost of the model year 2007 boat by $10,000; and that Williams had inflated the MSRP on the 2008 boat to make it appear that plaintiff was getting a better deal than he actually was.  Plaintiff contacted Rudholm for assistance in mediating the dispute with Williams involving the 2010 boat.  At the time he contacted Rudholm for assistance and prior to entering into the Settlement Agreement, plaintiff was equally aware that LNS was having financial difficulties, that Williams had attempted to inflate the price of the 2007 boat, and that Williams had in fact inflated the MSRP.  In fact, plaintiff indicated in a June 2010 email that the initial boat encounter had alerted his attorney to Williams' "business ethics"

and plaintiff had acted against the advice of his attorney by making the final payment to LNS on the 2010 boat in April 2010. *See* Exh. PX-55.

65. Regal did not commit an unfair act or practice within the meaning of the CSPA by devising the Settlement Agreement that formed the framework for plaintiff's purchase of the 2010 boat. Plaintiff testified at trial that Rudholm was simply the mediator for the parties, not the driver of the agreement.

66. Plaintiff did not prove by a preponderance of the evidence that Rudholm or any other Regal representative committed an unfair or deceptive act in the course of mediating the Settlement Agreement. Plaintiff's testimony that he was coerced into the 2010 Settlement Agreement by Rudholm's representation that LNS could not refund plaintiff's money for the 2008 boat is not fully credible. Both before and after Rudholm became involved in the settlement negotiations, plaintiff consistently explored with Williams the options of: (1) Williams selling the 2008 boat and refunding the sale proceeds to plaintiff, or (2) Williams selling the 2008 boat and putting the proceeds toward the purchase of a 2010 boat. Furthermore, when Rudholm initially became involved in the negotiations, he provided no indication in his communications that a refund of plaintiff's money on the 2008 boat was not an option.

67. Plaintiff did not prove by a preponderance of the evidence that Rudholm deceived plaintiff in connection with the 2010 boat purchase based on Rudholm's superior knowledge of Williams' financial circumstances. Plaintiff testified that he was aware of financial troubles and service issues that Williams was experiencing as early as August 2009, prior to the date plaintiff entered into the Settlement

Agreement. Plaintiff entered into the Settlement Agreement with knowledge of these issues and after receiving the advice of counsel.

68. Regal did not commit an unfair or deceptive act by accepting the purchase order from LNS for the 2010 boat showing that the boat had been financed through GE rather than paid for in cash by plaintiff. This act did not involve any wrongdoing by Regal, and there is no dispute that Regal accepted the purchase order, manufactured the boat, and delivered the boat built to the specifications it had received.

69. Regal did not commit any unfair and deceptive practice by delivering the MSO to GE. Regal was not involved in the financing of the boat and the evidence did not show that it failed to follow normal procedures in connection with the MSO.

70. Regal did not commit an unfair and deceptive practice by failing to release the 2010 boat from its manufacturing facility until May 17, 2010, or by failing to deliver the boat to LNS by a certain date. LNS was responsible for transporting the boat from Regal to the dealership, and any delays in shipping the boat following its manufacture were not attributable to Regal.

71. Regal did not commit any unfair and deceptive practice by delivering the boat with an inoperable EVC system and an interior that did not conform to plaintiff's product choices. The EVC system was covered by Volvo's warranty, and the interior color mistake was not attributable to Regal as plaintiff himself conceded in his email communications to LNS.

72. Regal did not commit unfair and deceptive practices by assuring plaintiff that it would fix any problems with the boat, including the generator/air conditioner,

fresh water pump, instrument panel lights, and fuel gage, and by telling plaintiff the company would "make him whole." As described in the Court's Findings of Fact and explained in the Conclusions of Law pertaining to the breach of warranty claims, Regal strove to solve both those defects and malfunctions in the 2010 boat that were covered by Regal's Limited Warranty, as well as others that were not its responsibility as manufacturer of the boat.

73. Plaintiff did not prove by a preponderance of the evidence that Regal committed unfair or deceptive practices by exhibiting a pattern of inefficiency and incompetence as demonstrated by the following acts and omissions alleged by plaintiff: (1) failing to take any action to cause the boat to be delivered to plaintiff until June 28, 2010; (2) instructing plaintiff that he would have to write letters to GE to try to get the MSO himself; (3) "holding a one-hour orientation for a nearly $300,000 boat, cut short so that [Regal's] employee could catch a plane and designed only to coerce Risner to sign off [on] the delivery checklist"; (4) telling plaintiff how he could fix the generator himself; and (5) telling plaintiff he could have the upholstery replaced himself and, if Regal deemed the cost reasonable, Regal would pay for it.

74. These acts were neither deceitful nor unfair, and they did not demonstrate a pattern of inefficiency and incompetency. To the contrary, the actions Regal took in response to the matters outlined by plaintiff demonstrate a pattern of efforts by Regal to go above and beyond its obligations as manufacturer to resolve problems and ensure customer satisfaction.

75. As explained in the Court's Findings of Fact and earlier Conclusions of Law,

plaintiff did not contact Regal to seek its assistance following delivery of the boat to LNS until the end of June 2010; plaintiff requested that LNS not deliver the boat to him before the end of June because he wanted LNS to fix the EVC system and resolve the interior issue, which were issues plaintiff had not asked Regal to become involved in up to that point; and once Regal became involved, it quickly took action to resolve problems with the boat.

76.     In addition, Regal's efforts to assist plaintiff in obtaining his MSO were not deceitful or unfair in any sense.  To the contrary, Regal went out of its way to assist plaintiff with the documentation for his boat once he requested assistance from Regal.

77.     Moreover, plaintiff praised Regal employee Snyder's assistance in conducting the orientation, and plaintiff's subsequent criticisms of the orientation therefore lack credibility for the reasons explained above.

78.     Regal's advice regarding the air conditioner/generator was reasonable.  Advising plaintiff, a contractor who was familiar with building matters and machinery, on how to resolve a problem of this nature himself was in no manner unfair or deceptive, particularly in light of plaintiff's admission that he could have fixed the air conditioning problem if he so desired.  Moreover, plaintiff was not required to fix the problem himself but was able to have the problem fixed by Hilltop Marine at Regal's expense.

79.     Finally, Regal's proposed resolution of the interior issue, which was not its mistake, was reasonable and fair.

80.     Plaintiff did not prove a violation of the CSPA by Regal in connection with his

purchase of the 2010 boat.[3]

## E. Negligent Misrepresentation

81.    To prove his claim for negligent misrepresentation under Ohio law, plaintiff is
       required to demonstrate that Regal "in the course of [its] business . . . or in any
       other transaction in which [it] has a pecuniary interest, supplie[d] false information
       for the guidance of [plaintiff] in [his] business transactions"; that Regal did so
       without exercising "reasonable care or competence in obtaining or communicating
       the information"; that plaintiff justifiably relied on that information; and that
       "pecuniary loss" resulted from that reliance.  *Delman v. City of Cleveland Heights*,
       534 N.E.2d 835, 838 (Ohio 1989).

82.    "A statement of opinion or belief such as occurs in 'puffing' generally cannot
       constitute a misrepresentation."  *Miami Valley Paper, LLC v. Lebbing Eng'g &
       Consulting Gmbh*, No. 1:05-cv-00702, 2009 WL 818618, at *12 (S.D. Ohio Mar.
       26, 2009) (quoting *Kondrat v. Morris*, 692 N.E.2d 246 (Ohio App. 8 Dist. 1997)).
       Thus, a representation that the price a buyer was getting was "a good deal" was
       held to be merely an opinion of the seller and therefore insufficient to establish the
       material misrepresentation element of a negligent misrepresentation claim.  *Id.*

83.    Predictions as to future events do not constitute actionable misrepresentations
       under the law of Ohio.  *Waste Mgmt., Inc. v. Danis Indus. Corp.*, No. 3:00CV256,
       2009 WL 347773, at *28 (S.D. Ohio Feb. 10, 2009).

84.    To determine whether a party's reliance was justified, the Court considers the
       relationship between the parties, the nature of the transaction, the form and

---

[3] Given that plaintiff has failed to demonstrate a violation of the CSPA, the Court need not address disputed issues as to the available remedies under the Act.

materiality of the representation, the parties' respective means and knowledge, and all other circumstances. *Johnson v. Church of the Open Door*, 902 N.E.2d 1002, 1007 (Ohio App. 9 Dist. 2008).

85. Plaintiff did not prove by a preponderance of the evidence that Regal committed negligent misrepresentations by telling him that LNS was a reputable dealer; by touting the quality of its boats in general and its intention to stand behind and fix the problems with the 2010 boat; and by representing to plaintiff that the 2010 boat would conform to the features and specifications plaintiff submitted to Williams.

86. None of the statements that form the basis for plaintiff's negligent misrepresentation claim constitute affirmative false statements that Regal made to him in connection with his purchase of the 2010 boat.

87. Insofar as plaintiff relies on Regal's promises of future satisfaction, his allegations are not actionable under a theory of negligent misrepresentation.

88. Regal's opinions as to the quality of its boats are "puffing" and are not actionable under a negligent misrepresentation theory.

89. Any statements Regal made regarding LNS's financial situation in April 2009 are not sufficiently connected to plaintiff's purchase of the 2010 boat to support plaintiff's negligent misrepresentation claim.

90. Moreover, statements Regal made regarding LNS's financial situation must be viewed in the context of the economic climate for the boating industry as a whole at the time the statements were made.  All dealers were experiencing financial distress, and operating under a forbearance agreement was the norm for boat dealers during this time period.  The fact that LNS was still selling boats and

securing financing for boats in April 2009 could be construed as an indicator of relative financial stability when considered in this broader context.

91.   Further, insofar as plaintiff relied on any representations by Regal regarding Williams' financial reputation to enter into the Settlement Agreement for the purchase of the 2010 boat, plaintiff's reliance was not justified.  Plaintiff concedes that as of August 2009, he was aware of LNS's financial difficulties and he had reason to be mistrustful of Williams based on the parties' past dealings.  Plaintiff was a sophisticated businessman who had experience in large construction projects and complex business deals.  Plaintiff entered into the Settlement Agreement with the advice of counsel; plaintiff acknowledged that counsel was aware of Williams' business practices from the parties' initial boat encounter; and plaintiff agreed to the purchase of the 2010 boat after many weeks of negotiations with Williams.

92.   In light of all the circumstances, plaintiff did not prove by a preponderance of the evidence that Regal made negligent misrepresentations in connection with the 2010 boat transaction on which plaintiff justifiably relied.

**F. Intentional Misrepresentation**

93.   The elements of a fraud or intentional misrepresentation claim under Ohio law are: (1) a misrepresentation of a material fact; (2) made with knowledge of its falsity, or with such utter disregard as to its truth that knowledge may be inferred; (3) made with the intent to induce another's reliance on it; (4) justifiable reliance upon the representation or concealment; and (5) a resulting injury proximately caused by the reliance.  *Burr v. Bd. of Cnty. Comm'rs*, 491 N.E.2d 1101, 1105 (Ohio 1986).

94.   For the same reasons plaintiff failed to prove his claim for negligent

misrepresentation, plaintiff did not prove by a preponderance of the evidence that Regal committed intentional misrepresentations by telling him that LNS was a reputable dealer in April 2009; by touting the quality of its boats in general and its intention to stand behind and fix the problems with the 2010 boat; and by representing to plaintiff that the 2010 boat would conform to the features and specifications he submitted.

## III.  Conclusion

In accordance with the foregoing findings of fact and conclusions of law, the Court finds that plaintiff has not proved any of his claims against Regal by a preponderance of the evidence. The Court therefore finds that Regal is entitled to judgment in its favor on all claims against it.

<b>IT IS THEREFORE ORDERED THAT:</b>

The Court finds in favor of defendant Regal and against plaintiff on all claims.  Judgment is **GRANTED** in favor of defendant Regal and against plaintiff.  The Clerk is **DIRECTED** to enter judgment accordingly.

Date:  3/27/14                                 _s/Karen L. Litkovitz_____
                                              Karen L. Litkovitz, Magistrate Judge
                                              United States District Court